**The RANCH HOUSE, INC., d/b/a the Platinum Club, d/b/a the Platinum Entertainment Center, d/b/a the Platinum Sports Bar, Plaintiff,**

v.

**Larry AMERSON, Sheriff of Calhoun County, and the Calhoun County Commission, a body politic as elective representatives of Calhoun County, a political subdivision of the State of Alabama, Defendants.**

No. CV 98–PT–1638–E.

United States District Court, N.D. Alabama, Eastern Division.

Sept. 30, 1998.

George A. Monk, Merrill Porch Dillon &
Fite, Anniston, AL, Steven H. Swander, Fort
Worth, TX, for Ranch House Inc.

George D. Robinson, Wilson Punroy Tur-
ner & Robinson, Anniston, AL, for Larry
Amerson.

Thomas M. Sowa, State of Alabama, Cal-
houn County, Anniston, AL, for Calhoun
County Com'n.

### MEMORANDUM OPINION

PROPST, Senior District Judge.

This cause came on to be heard at a bench
trial. Without objection, the court, pursuant
to Fed. R. of Civ. P. 65, advanced and consol-
idated the trial of this action on the merits
with a requested hearing on plaintiff's appli-
cation for preliminary injunction. Trial was
held on August 24, 1998.

*Facts*

The parties stipulated the facts which are pertinent to the issues submitted for decision by the court. These facts include: [1]

4. Since 1993, the plaintiff has owned and operated an establishment known as the Platinum Club which, as its main attraction, provides entertainment consisting of topless and nude female dancing. The Platinum Club is not licensed to sell, serve, or otherwise provide for the distribution or consumption of alcoholic beverages in connection with the nude or topless dance performances conducted on its premises.

5. Neither the plaintiff's shareholder, Harvey Bowman, nor any manager, employee or entertainer, has been arrested or charged with an obscenity violation for activities at the Platinum Club.

6. The plaintiff further owns an adjacent facility known as the Platinum Sports Bar which is licensed to serve beer and wine.

7. The plaintiff's business is located in an unincorporated area of Calhoun County lying within the police jurisdiction of a municipality. The plaintiff has paid taxes to the City of Anniston, Alabama.

8. An occupied, single-family residential structure is located within 1,000 feet of the plaintiff's establishment.

13. Act No. 98–467 does not operate as a "total taking" of the plaintiff's property, and there are remaining economic uses to which the plaintiff might subject its property presently housing the Platinum Club.

14. There is, at present, land in Calhoun County, Alabama and elsewhere in the State of Alabama that is not within 1000 feet of one of the protected uses set forth in Section 13A–12–200.5(4).

15. The defendant Sheriff has, through his counsel, advised the plaintiff, through its counsel, of his intent to enforce the statute according to its terms should it be deemed constitutional, if the District Attorney agrees to prosecute such action.

No further evidence was offered at the trial by any party.

In its complaint, the plaintiff alleges that it, originally, operated a business which not only provided live entertainment of erotic female dancers for its customers, but also sold beer and wine. In response to assertions by the City of Anniston, Alabama, plaintiff "reconfigured" its business by selling beer and wine in a building adjacent to the erotic dancing building.

*Plaintiff's Contentions*

Plaintiff claims that the following provisions of 1998 enacted Alabama statutes constitute content-based restrictions on protected expression in violation of the First Amendment to the U.S. Constitution: Section 13A–12–200.11. Plaintiff emphasized at the hearing that its challenge to this section is based totally on facial invalidity.

Plaintiff further claims that the following provisions of the 1998 enacted Alabama statutes are unconstitutional as being facially violative of the First and Fourteenth Amendments to the U.S. Constitution: Section 13A–12–200.5(4). Plaintiff claims that said section is "overbroad, vague and without proper foundation."

Plaintiff had also claimed that Section 13A–12–200–12 violates the First and Fourteenth Amendments, but now acknowledges that this claim is not ripe for consideration.

*Statutory Provisions*

Section 13A–12–200.11 reads as follows:

It shall be unlawful for any business establishment or any private club to show or allow to be shown for entertainment purposes the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering, or showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state. A violation of this section shall be a Class C felony.

If a person is held under this section in the county jail, one-half of any fines collected and due to be deposited to the State General Fund for violations of this section

---

1. The court has used the paragraph numbers used by the parties in their Stipulated Facts.

shall be paid by the comptroller to the General Fund of the county where the person is held for the operation of the county jail.

Section 1A–12–200.5(4) reads as follows:

It shall be unlawful for any person to operate an adult bookstore, adult movie house, adult video store, or other form of adult-only enterprise within 1,000 feet of a church, place of worship, church bookstore, public park, public housing project, day-care center, public or private school, college, recreation center, skating rink, video arcade, public swimming pool, private residence, or any other place frequented by minors. Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than ten thousand dollars ($10,000) and may also be imprisoned in the county jail for not more than one year.

Plaintiff acknowledges that its facility is an "adult-only enterprise" as defined in § 13A–12–200.1(3).

### Conclusions of Law

The facts are undisputed, so the sole issues are issues of law. The court will address each contested statutory provision.

### Section 13A–12–200.11

▉ This issue is governed by the case of *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) and subsequent cases which consider and apply *Barnes.*[2] The following quotes from *Barnes* are pertinent:

Several of our cases contain language suggesting that nude dancing of the kind involved here is expressive conduct protected by the First Amendment. In *Doran v. Salem Inn. Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975), we said: "[A]lthough the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression, we recognized in *California v.*

*LaRue,* 409 U.S. 109, 118, 93 S.Ct. 390, 397, 34 L.Ed.2d 342 (1972), that this form of entertainment might be entitled to First and Fourteenth Amendment protection under some circumstances." In *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981), we said that "[f]urthermore, as the state courts in this case recognized, nude dancing is not without its First Amendment protections from official regulation" (citations omitted). These statements support the conclusion of the Court of Appeals that nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so.

*Id.* at 565–66, 111 S.Ct. 2456.

... Respondents contend that while the state may license establishments such as the ones involved here, and limit the geographical area in which they do business, it may not in any way limit the performance of the dances within them without violating the First Amendment.

*Id.* at 566, 111 S.Ct. 2456.

"... Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.,* at 376–377, 88 S.Ct., at 1678–1679 (footnotes omitted) (citing *U.S. v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).

*Id.* at 567, 111 S.Ct. 2456.

... Public indecency statues such as the one before us reflect moral disapproval of

---

**2.** Since the court is of the opinion that *Barnes* and subsequent Eleventh Circuit court cases control, it will not recite the history of cases leading up to *Barnes.* For a good discussion in this area,

see *Peliford v. Whisante, et al,* CA 98–S–1967–NE (N.D.Al.1998). That case addresses the same statutes.

people appearing in the nude among strangers in public places.

*Id.* at 568, 111 S.Ct. 2456.

This and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation. In *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446 (1973), we said:

> "In deciding *Roth [v. United States,* 354 U.S. 476 [77 S.Ct. 1304, 1 L.Ed.2d 1498](1957)], this Court implicitly accepted that a legislature could legitimately act on such a conclusion to protect 'the social interest in order and morality'. [*Id.*], at 485 [77 S .Ct., at 1309]." (Emphasis omitted.)

And in *Bowers v. Hardwick,* 478 U.S. 186, 196, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986), we said:

> "The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed."

Thus, the public indecency statute furthers a substantial government interest in protecting order and morality.

This interest is unrelated to the suppression of free expression. Some may view restricting nudity on moral grounds as necessarily related to expression. We disagree. It can be argued, of course, that almost limitless types of conduct—including appearing in the nude in public—are "expressive," and in one sense of the word this is true. People who go about in the nude in public may be expressing something about themselves by so doing. But the court rejected this expansive notion of "expressive conduct" in *O'Brien,* saying:

> "We cannot accept the view that an apparently limitless variety of conduct can

be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 391 U.S., at 376, 88 S.Ct., at 1678.

*Id.,* at 569–70, 111 S.Ct. 2456.

But we do not think that when Indiana applies its statute to the nude dancing in these nightclubs it is proscribing nudity because of the erotic message conveyed by the dancers. Presumably numerous other erotic performances are presented at these establishments and similar clubs without any interference from the state, so long as the performers wear a scant amount of clothing. Likewise, the requirement that the dancers don pasties and a G-string does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic.

*Id.* at 570–71, 111 S.Ct. 2456.

. . . It is without cavil that the public indecency statute is "narrowly tailored;" Indiana's requirement that the dancers wear at least pasties and a G-string is modest, and the bare minimum necessary to achieve the state's purpose.

*Id.* at 572, 111 S.Ct. 2456.

Although such performance dancing is inherently expressive, nudity per se is not. It is a condition, not an activity, and the voluntary assumption of that condition, without more, apparently expresses nothing beyond the view that the condition is somehow appropriate to the circumstances.

*Id.* at 581, 111 S.Ct. 2456.

Justice Souter concurred in the judgment of "the opinion of the Court", but wrote separately. Pertinent quotes from his opinion include: [3]

> . . . I nonetheless write separately to rest my concurrence in the judgment, not on the possible sufficiency of society's moral views to justify the limitations at issue, but on the State's substantial interest in combating the secondary effects of adult enter-

---

**3.** It would appear that Judge Souter's opinion could be even stronger than "the opinion of the Court" in that, while he apparently did not reject, at least not totally, the morality basis for the Indiana law, he added a "secondary effects"

basis. References to "secondary effects" generally involve consideration of the public in general or surrounding neighborhoods. Perhaps it would also be appropriate to consider the "secondary effects" on the dancers themselves.

tainment establishments of the sort typified by respondents' establishments.

It is, of course, true that this justification has not been articulated by Indiana's legislature or by its courts. As the plurality observes, "Indiana does not record legislative history, and the state's highest court has not shed additional light on the statute's purpose," *ante,* 111 S.Ct. at 2461. While it is certainly sound in such circumstances to infer general purposes "of protecting societal order and morality... from [the statute's] text and history," *ibid,* I think that we need not so limit ourselves in identifying the justification for the legislation at issue here, and may legitimately consider petitioners' assertion that the statute is applied to nude dancing because such dancing "encourage [prostitution, increased sexual assaults, and attracts] other criminal activity." Brief for Petitioners 37. *Id.* at 582, 111 S.Ct. 2456.

... In my view, the interest asserted by petitioners in preventing prostitution, sexual assault, and other criminal activity, although presumably not a justification for all applications of the statute, is sufficient under *O'Brien* to justify the State's enforcement of the statute against the type of adult entertainment at issue here.

At the outset, it is clear that the prevention of such evils falls within the constitutional power of the State, which satisfies the first *O'Brien* criterion. See *id.,* at 377, 88 S.Ct., at 1679. The second *O'Brien* prong asks whether the regulation "furthers an important or substantial governmental interest." *Ibid.* The asserted state interest is plainly a substantial one; the only question is whether prohibiting nude dancing of the sort at issue here "furthers" that interest. I believe that our cases have addressed this question sufficiently to establish that it does.

In *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), we upheld a city's zoning ordinance designed to prevent the occurrence of harmful secondary effects, including the crime associated with adult entertainment, by protecting approximately 95% of the city's area from the placement of motion picture theaters emphasize " 'matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas" ... for observation by patrons therein.' " *Id.,* at 44, 106 S.Ct., at 927. Of particular importance to the present enquiry, we held that the city of Renton was not compelled to justify its restrictions by studies specifically relating to the problems that would be caused by adult theaters in that city. Rather, "Renton was entitled to rely on the experiences of Seattle and other cities," *Id.,* at 51, 106 S.Ct., at 931, which demonstrated the harmful secondary effects correlated with the presence "of even one [adult] theater in a given neighborhood." *Id.,* at 50, 106 S.Ct., at 930; cf. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, n. 34, 96 S.Ct. 2440, 2453, n. 34, 49 L.Ed.2d 310 (1976)(legislative finding that "a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime"); *California v. LaRue,* 409 U.S. 109, 111, 93 S.Ct. 390, 393, 34 L.Ed.2d 342 (1972)(administrative findings of criminal activity associated with adult entertainment).

The type of entertainment respondents seek to provide is plainly of the same character as that at issue in *Renton, American Mini Theatres,* and *LaRue.* It therefore is no leap to say that live nude dancing of the sort at issue here is likely to produce the same pernicious secondary effects as the adult films displaying "specified anatomical areas" at issue in *Renton.* Other reported cases from the Circuit in which this litigation arose confirm the conclusion. See, *e.g., United States v. Marren,* 890 F.2d 924, 926 (7th Cir.1989)(prostitution associated with nude dancing establishment); *United States v. Doerr,* 886 F.2d 944, 949 (7th Cir. 1989)(same). In light of *Renton's* recognition that legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects, the State of Indiana could reasonably conclude that forbidding nude entertainment of the type offered at the Kitty Kited Lounge and the Glen Theatre's "bookstore" furthers its interest in pre-

venting prostitution, sexual assault, and associated crimes.

*Id.* at 583–84, 111 S.Ct. 2456.

. . . . .

...It is to say, rather, only that the effects are correlated with the existence of establishments offering such dancing, without deciding what the precise causes of the correlation actually are. It is possible, for example, that the higher incidence of prostitution and sexual assault in the vicinity of adult entertainment locations result from the concentration of crowds of men predisposed to such activities, or from the simple viewing of nude bodies regardless of whether those bodies are engaged in expression or not.

*Id.* at 585–86, 111 S.Ct. 2456.

Because the State's interest in banning nude dancing results from a simple correlation of such dancing with other evils, rather than from a relationship between the other evils and the expressive component of the dancing, the interest is unrelated to the suppression of free expression.

. . . . .

... Similarly here, the "secondary effects" justification means that enforcement of the Indiana statute against nude dancing is "justified without reference to the content of the regulated [expression]," *ibid.* (emphasis omitted), which is sufficient, at least in the context of sexually explicit expression, to satisfy the third prong of the *O'Brien* test.

*Id.* at 586, 111 S.Ct. 2456.

... Nor, so far as we are told, is the dancer or her employer limited by anything short of obscenity laws from expressing an erotic message by articulate speech or representational means; a pornographic movie featuring one of respondents, for example, was playing nearby without any interference from the authorities at the time these cases arose.

*Id.* at 587, 111 S.Ct. 2456.

Applying *Barnes* and its *O'Brien* analysis, it is clear here that (1) the statutory provi-

sions are within the constitutional power of Alabama; (2) the provisions further an important and substantial governmental interest; and (3) the governmental interest is unrelated to the suppression of free expression. The only remaining issue is whether the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the governmental interest.

The fourth *O'Brien–Barnes* factor necessarily involves a consideration of the extent of opaque cover of body parts which the statute mandates. Pertinent to this issue are the following quotes from *Cafe 207, Inc. v. St. Johns County,* 856 F.Supp. 641 (M.D.Fla. 1994), *affirmed,* 66 F.3d 272, *cert. denied,* 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 647 (1996).[4]

... The Plaintiff alleges that the nude dancing performed for its patrons is non-obscene, constitutionally protected communication; that the nude human body is a thing of beauty which, when combined with music and rhythmic motion in the form of dance, conveys an "important message of eroticism." The Plaintiff also claims that its promotion of nude dance and eroticism is, in part, a deliberate and intentional political protest against those who would choose to impose their narrow view of morality through legislation.

. . . . .

One distinctive feature of the ordinance is its definition of the terms "breast," "buttocks," and "nudity." In net effect, a female is "nude" whenever more than two-thirds of the buttocks or more than three-fourths of the breasts are exposed: and detailed definitions of those body parts are provided to facilitate making the fractional measurements necessary in applying the ordinance to any given state of dress (or undress, as the case may be).

*Id.* at 643.[5]

Thus far in the analysis, therefore, applying *Barnes* to the facts of this case, it is

---

**4.** As here, *Cafe 207* involved a situation where no alcoholic beverages were served directly on site.

**5.** While this court has not undertaken a geometric anatomical measurement analysis, it would appear that the exposure limitation in the *Cafe*

clear that the first three elements of the *O'Brien* four-part test are satisfied by Ordinance 92–12. The law, as an exercise of the County's police power, is clearly within its constitutional authority. It also serves a substantial and important governmental interest in protecting order and morality *and* in combating the secondary effects of nudity in adult entertainment establishments of the sort typified by the Plaintiff's Cafe Erotica. And, neither of those governmental interests is related to the suppression of free expression as such.

*Id.* at 644.

Evidence about secondary effects or, rather, the lack of them, is also clearly foreclosed. It is now established as a matter of law by Supreme Court jurisprudence culminating in *Barnes,* that secondary effects of proscribed conduct may be taken into consideration by a court in evaluating the governmental interests justifying impingement upon free speech rights even when, as in *Barnes,* there is no legislative history demonstrating that the lawmakers actually considered secondary effects or any other specific factor (such as protecting order and morality) in enacting the challenged law.

*Id.* at 645.

The *Cafe 207* court dismissed the argument that *Barnes* only allows requirement of cover by pasties and G-strings. The court stated:

In this case St. Johns County was not content with a law such as Indiana's in which pasties and a G-string are sufficient to separate a state of lawful dress from a state of unlawful nudity. Rather, the County's ordinance requires slightly, but only slightly, more body covering than the Indiana statute validated in *Barnes.* The Plaintiff argues, however, that precisely because the Court in *Barnes* approved a regulatory statute which was satisfied by the wearing of pasties and a G-string, the requirement of those articles of clothing in the *only* dress requirement that can constitutionally be imposed on expressive dancing. This, I believe, is a misreading of *Barnes.* All the court said in *Barnes,* in

*207* case was at least as restrictive as that in the

both the plurality opinion and in the opinion of Justice Souter, was that an anti-nudity law which is satisfied by the wearing of pasties and a G-string constituted a minimal intrusion on the expressive content of dancing and was the minimum requirement necessary to achieve the state's purpose. This is nothing more, after all, than a practical recognition that there *are* no articles of clothing having less dimension than pasties and a G-string, and this implicit observation does not constitute a holding that pasties and a G-string are also the *maximum* requirements of dress that an anti-nudity ordinance may impose. The Court simply did not reach and did not decide that issue.

*Id.* at 645–46.

. . .Moreover, the Supreme Court has been "loath to second-guess the Government's judgment" with respect to the degree of regulation necessary to further the government's legitimate interests. *Id.,* 492 U.S. at 478, 109 S.Ct. at 3034. (Emphasis added).

. . . . .

Once it is established that a burden may be imposed on the expressive content of erotic dancing by requiring some clothing—pasties and a G-string—then it does not seem to me from a constitutional standpoint that a modest increase in the amount of body covering required by the law really adds any significant, incremental burden on the *expressive* component of the dance. As Justice Souter observed, ". . . the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." *Barnes,* 501 U.S. at 586, 111 S.Ct. at 2471. So, in this case, that erotic message may still be expressed with exposure of three-fourths of the breasts and two-thirds of the buttocks in the same manner it would be expressed while wearing pasties and a G-string. *Or, even if there is some added incidental repression of speech, deference must be granted to the law making authority under Board of Trustees v. Fox, supra, in deciding the*

Alabama statute.

*degree of regulation necessary to further the government's legitimate interests.* (Emphasis added).

To be sure, so long as an anti-nudity statute is subject to say First Amendment scrutiny, i.e., an *O'Brien* evaluation, there must be a line in every case beyond which the law makers cannot go in requiring clothing or prohibiting exposure in some contexts. See *De Weese v. Town of Palm Beach,* 812 F.2d 1365 (11th Cir.1987)(striking down as an irrational violation of the plaintiff's liberty interests under the Fourteenth Amendment an ordinance requiring male joggers to wear shirts.) Definition of that constitutional line, however, must await a case-by-case development of the law and further guidance from the Supreme Court. Suffice it to say that Ordinance 92–12 of St. Johns County does not cross that constitutional boundary.

*Id.* at 646.

 The *Cafe 207* case rejected another argument raised by the plaintiff here. The court stated:

... The Court began its analysis by noting that ordinarily "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied

unconstitutionally to others, in other situations not before the Court." 413 U.S. at 610, 93 S.Ct. at 2915. The court then acknowledged that First Amendment cases had come to be recognized as an exception to the general rule and that litigants are permitted to raise overbreadth claims when the "statute's very existence may cause others not before the Court to refrain from constitutionally protected speech or expression." *Id.* at 612, 93 S.Ct. at 2916. The Court noted, however, that when First Amendment overbreadth claims have been invoked against ordinary criminal laws that are sought to be applied to protected conduct, the usual remedy is to reverse any criminal conviction flowing from the law as unconstitutionally applied, not to adjudicate that the law itself is facially invalid.

*Id.* at 647.[6]

The principles distilled from these controlling decisions are that the overbreadth doctrine as an exception to the requirement of standing in First Amendment cases is to be sparingly applied; that this is especially true in cases like this one involving a criminal statute and a plaintiff whose asserted First Amendment interest constitutes expressive conduct as distin-

---

6. See also *J & B Social Club No. 1. Inc. v. City of Mobile,* 920 F.Supp. 1241 (S.D.Ala.1996). See also *American Booksellers v. Webb,* 919 F.2d 1493, 1499 (11th Cir.1990) where the court stated:... Outside of the First Amendment context, the Supreme Court has noted the difficulties inherent in a facial challenge:

> that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid. The fact that [the challenged statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid...."

*United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

. . . . .

... Since the overbreadth doctrine in effect requires courts to evaluate the potential reach of a statute, conceivable sets of circumstances, and possible direct and indirect burdens on speech, "[t]he Supreme Court has noted that the overbreadth doctrine is 'strong medicine' that should be employed only 'with hesitation,

and then "only as a last resort." ' " *Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389, 1391 (8th Cir.1986) (quoting *New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982)) (in turn quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916–17, 37 L.Ed.2d 830 (1973)).

When the regulation is not directed at the origin of expression, or at the ultimate right of a person (in this case, an adult) to present or procure protected expression, it does not impinge upon "mere speech"; rather, it regulates the method of presenting, or the form of, expression. Regulations on display affect "conduct plus speech." *Upper Midwest Booksellers,* 780 F.2d at 1391–92; *M.S. News Co. v. Casado,* 721 F.2d 1281, 1289 (10th Cir.1983); *American Booksellers Ass'n v. Rendell,* 332 Pa.Super. 537, 581, 481 A.2d 919, 941 (1984). "[W]hen conduct plus speech is involved, the overbreadth must be 'real' and 'substantial' in relation to [the regulation's] 'plainly legitimate sweep' before the [regulation] should be invalidated on its face." *Upper Midwest Booksellers,* 780 F.2d at 1391–92 (quoting *Ferber,* 458 U.S. at 770, 102 S.Ct. at 3361–62).

guished from protected pure speech; and for the overbreadth claim to be entertained in such a case the excessive scope of the statute or ordinance being reviewed must not only be real but substantial, and not subject to cure through case-by-case analysis and limiting judicial construction or partial invalidation.

*Id.* at 648.

This court agrees with the holding in *Cafe 207.* The ultimate issue is the reasonableness of the incidental restriction. In *Iskcon Miami, Inc. v. Metropolitan Dade County,* 147 F.3d 1282, 1286 (11th Cir., 1998), the court in addressing the reasonableness of restrictions on speech by a government acting in a proprietary capacity in a nonpublic forum stated:

> ... Restrictions must still be reasonable and "not an effort to suppress the speaker's activity due to disagreement with the speaker's view," [*International Society for Krishna Consciousness, Inc. v.] Lee,* 505 U.S. [672] at 679, 112 S.Ct. 2701, 120 L.Ed.2d 541 [(1992)]. At the same time, "[t]he restriction 'need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation,'." *Id.* at 683, 112 S.Ct. 2701 (quoting *Kokinda,* 497 U.S. at 730, 110 S.Ct. 3115 (plurality opinion)).

In *Georgia Manufactured Housing v. Spalding County,* 148 F.3d 1304, (11th Cir. 1998), the court stated:

> The rational basis test consists of a two-prong inquiry:
>
>> The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose-a goal-which the enacting government body *could* have been pursuing. The *actual* motivations of the enacting governmental body are entirely irrelevant.
>>
>> The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose. The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body. As long as

reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny.

*Haves v. City of Miami,* 52 F.3d 918, 921–22 (11th Cir.1995)(internal quotations and citations omitted); *see also, TRM, Inc. v. United States,* 52 F.3d 941, 945–46 (11th Cir.1995).

Further, that:

> Reasonable minds may differ as to where the line should be drawn or whether a line should be drawn at all, but the discretion to resolve that disagreement lies with the County, not the courts. *Haves,* 52 F.3d at 923–24.

*Id.* at 1307.

It is not up to courts to attempt to calibrate the exact line where opaque cover must begin. The issue is whether a regulation unreasonably conflicts with protected expression. As Justice Souter stated, "Nor, so far as we are told, is the dancer or her employer limited by anything short of obscenity laws from expressing an erotic message by articulated speech or representational means...."

In *Sammy's of Mobile, Ltd. v. City of Mobile,* 140 F.3d 993, 998 (11th Cir.1998), the court stated:

> The Supreme Court, however, does not equate reference to content with suppression of content. The Court applies the *Barnes–O'Brien* intermediate level of scrutiny to ordinances which distinguish between nude and clothed entertainment, but which are aimed only at the secondary effects of nude entertainment. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (ordinance "by its terms [was] designed to prevent crime, protect city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life"); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71 n. 34, 96 S.Ct. 2440, 2453 n. 34, 49 L.Ed.2d 310 ("[i]t is [the] secondary

effect [of crime and urban deterioration] which these zoning ordinances attempt to avoid, not the dissemination of 'offensive speech' ").[7]

The court notes that the dancers can perhaps supplement their gyrations with talk which can further convey their intended erotic message. At the hearing, the plaintiff stated that part of the content of a dancer's message is, "I am available." The court does not reach the issue of whether such a message is inherently illegal. If taken literally, it can certainly lead to the secondary effects of prostitution, or violence by those who may be rejected.

The court notes, in retrospect, that its rather comical inquiry at trial with regard to the perspective of the "top of the nipple" was not a first. See *Dodger's Bar & Grill, Inc. v. Johnson County Bd. of County Commissioners*, 32 F.3d 1436, 1444–45 (10th Cir.1994) where the court stated:

Amicus Platinum Club offers additional inventive hypotheticals in an attempt to demonstrate the ABC's vagueness. Amicus argues that the ABC provision prohibiting display or simulated display of the "female breast below the top of the nipple" is vague because it is

equally amenable to at least two equally reasonable interpretations depending on whether the "top of the nipple" is construed to be the most cephalic point of the areola, (as might seem reasonable if for purposes of this section the subject person is to be viewed and analyzed while standing), or whether the top is construed as the most ventral point on the nipple, (as might seem reasonable if the subject person is to be viewed from a reclining or horizontal position).

Amicus Br. at 12–13. We agree with the defendants that this argument "ignores the common reference to the top of one's anatomy being in the vicinity of the head with a

common understanding that the head does not change its relationship to the rest of the body if one lies down." Appellees' Br. at 31.

This court further notes that *Dodger's Bar*, in a decision substantially influenced by Twenty First Amendment considerations, upheld regulations substantially similar, if not more restrictive, than Section 13 A–12–200.11 here. While the Twenty First Amendment analysis, as such, *may* have no bearing here and may no longer be applicable in general, this court does note that the case did apparently consider whether the defendants had a rational basis for their regulation. The case also has a good discussion on overbreadthness and vagueness.

*Section 13A–12–200.5* [8]

■ This issue is governed by the holding in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) and subsequent cases.

In *Renton*, the Court stated:

Describing the ordinance as a time, place, and manner regulation is, of course, only the first step in our inquiry. This Court has long held that regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment. See *Carey v. Brown*, 447 U.S. 455, 462–463, and n. 7, 100 S.Ct. 2286, 2291, and n. 7, 65 L.Ed.2d 263 (1980); *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 98–99, 92 S.Ct. 2286, 2289, 2291–2292, 33 L.Ed.2d 212 (1972). On the other hand, so-called "content-neutral" time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication. See *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82

7. The court does not reach the issue of whether the mere slight separation, in *proximate* facilities, of the sale of alcoholic beverages and nude dancing is sufficient to overcome the alcoholic beverages issues in *Sammy's of Mobile, supra*. Common sense indicates a continued association. This court does not, however, rely on this association in reaching its decision. It is not now entirely clear what the significance of alcohol

sales is in such matters. See, however, *Sammy's of Mobile, supra*.

8. At the trial the plaintiff acknowledged that, if the court upholds the constitutionality of Section 13A–12–200.11, this issue is moot. The court addresses it *in the alternative*.

L.Ed.2d 221 (1984); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 807, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984); *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647–648, 101 S.Ct. 2559, 2563–2564, 69 L.Ed.2d 298 (1981).

*Id.* at 46–47, 106 S.Ct. 925.

It was with this understanding in mind that, in *American Mini Theatres,* a majority of this Court decided that, at least with respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to "content-neutral" time, place, and manner regulations. Justice STEVENS, writing for the plurality, concluded that the city of Detroit was entitled to draw a distinction between adult theaters and other kinds of theaters "without violating the government's paramount obligation of neutrality in its regulation of protected communication," 427 U.S. at 70, 96 S.Ct., at 2452, noting that "[i]t is th[e] secondary effect which these zoning ordinances attempt to avoid, not the dissemination of 'offensive' speech," *id.,* at 71, n. 34, 96 S.Ct., at 2453, n. 34. Justice POWELL, in concurrence, elaborated:

"[The] dissent misconceives the issue in this case by insisting that it involves an impermissible time, place, and manner restriction based on the content of expression. It involves nothing of the kind. We have here merely a decision by the city to treat certain movie theaters differently because they have markedly different effects upon their surroundings.... Moreover, even if this were a case involving a special governmental response to the content of one type of movie, it is possible that the result would be supported by a line of cases recognizing that the government can tailor its reaction to different types of speech according to the degree to which its special and overriding interests are implicated."

*Id.* at 49, 106 S.Ct. 925.

... The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

. . . . .

... Moreover, the Renton ordinance is "narrowly tailored" to affect only that category of theaters shown to produce the unwanted secondary effects, thus avoiding the flaw that proved fatal to the regulations in *Schad v. Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), and *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

. . . . .

... That Renton chose first to address the potential problems created by one particular kind of adult business in no way suggests that the city has "singled out" adult theaters for discriminatory treatment.

. . . . .

In sum, we find that the Renton ordinance represents a valid governmental response to the "admittedly serious problems" created by adult theaters.

*Id.* at 51–54, 106 S.Ct. 925.

In *International Eateries Of America, Inc. v. Broward County, Florida,* 941 F.2d 1157 (11th Cir.1991), the court stated:

The regulation of non-obscene nude dancing often has been addressed in the federal courts. On several occasions, the Supreme Court has assumed, without deciding, that nude dancing is protected expression under the first amendment. See *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981)("nude dancing is not without its First Amendment protections from official regulation"); *see also Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). In a related

context, the Supreme Court has held that under some circumstances cities may enact zoning ordinances that require adult movie theaters to locate only in certain areas, provided that the purpose of the regulation is to control the "secondary effects" of these businesses. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

*Id.* at 1159.

There has been considerable confusion in the Court's cases as to when each analysis should apply. In recent years, however, the Court has stated several times that "in the last analysis [the *O'Brien* test] is little, if any, different from the standard applied to time, place, or manner restrictions." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984); *see also Barnes*, 111 S.Ct. at 2460 (opinion of Rehnquist, C.J.) (noting the similarities and applying *O'Brien* ); *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989) (noting the similarities and applying time, place, and manner analysis). Although the wisdom of this trend toward a single standard has been questioned, *see* S. Williams, *Content Discrimination and the First Amendment*, 139 U.PA.L.REV. 615, 636–54 (1991), it is sufficient for our purposes that the Supreme Court has determined that under current Court doctrine the answer should be the same regardless of which analysis is used. Because we conclude that the ordinance at issue in this case more closely resembles the ordinance in *Renton* than the statute in *Barnes*, we follow *Renton* and apply time, place, and manner analysis.

*Id.* at 1161 n. 2.

... In *Renton*, the Court recognized that a city's interest in protecting the quality of urban life from the secondary effects of adult businesses is indeed substantial. *Renton*, 475 U .S. at 50, 106 S.Ct. at 930. The distance ordinances prohibit the location of an "adult nightclub" within 500 feet of a residentially zoned district or 1000 feet

of a church. The ordinances also specifically state that certain businesses have a "deleterious effect" on the residential and business areas around them and that the purpose of the ordinance is to "ensure that these adverse effects will not contribute to the blighting and downgrading of the surrounding neighborhood." Thus, the ordinances are aimed at the very type of harm that the *Renton* Court found to create a substantial government interest.

*Id.* at 1162.

We next address whether the distance ordinances are narrowly tailored to further the County's interest in combating the secondary effects of adult entertainment establishments. In *Renton*, the Court stated that the ordinance was narrowly tailored because it affected "only that category of theaters shown to produce the unwanted secondary effects . . . ." *Renton*, 475 U.S. at 52, 106 S.Ct. at 931. Here, the ordinances are of a similarly limited scope, focusing only on those businesses likely to produce secondary effects.

*Id.* at 1163.

In *American Booksellers v. Webb, supra*, 919 F.2d at 1500–01, the court stated:

We decline to restate the bedrock case law and general principles of First Amendment jurisprudence which guide our analysis. We are content to note that (1) content-based restrictions on speech survive constitutional scrutiny only under extraordinary circumstances; but (2) material judged "obscene" under the appropriate constitutional standard is not protected by the First Amendment; (3) indirect burdens placed on protected speech in an effort to regulate obscenity must be supported by important state interests and should not be unnecessarily burdensome; and (4) the state's interest in protecting its youth justifies a limited burden on free expression. See generally [*American Booksellers Association, Inc., v. Webb*] (*Webb II*), 643 F.Supp. [1546] at 1551–52 [(N.D.Ga.1986)] (and cases cited therein).

Several courts evaluating variously defined display regulations such as the in-

stant one have emphasized that the state's legitimate interest in protecting its young must be balanced against the right of adults to have access to protected material. *See, e.g., Upper Midwest Booksellers,* 780 F.2d at 1394–95; *Webb II,* 643 F.Supp. at 1552. On the one hand, a state's interest in protecting children from exposure to material obscene as to minors is a substantial and important state interest. *Ferber,* 458 U.S. at 757, 102 S.Ct. at 3354–55 (1982); *Ginsberg,* 390 U.S. at 639–42, 88 S.Ct. at 1280–82. On the other ·hand, the indirect burden on adults' First Amendment right to have access to material not obscene for adults must be narrowly drawn. *See Upper Midwest Booksellers,* 780 F.2d at 1396–97 (regulation must leave open adequate alternative channels, must not restrict expression at its source, and must not impose "significant" restrictions on adult access); *M.S. News Co.,* 721 F.2d at 1288 (restriction on adults' access to material that is not obscene as to them must be reasonable); *Rendell,* 332 Pa.Super. at 581, 481 A.2d at 941 ("incidental restrictions on First Amendment freedoms must be limited to those essential to the furtherance of that interest") (citation omitted).

*Id.* at 1500–01.

We see no relevant distinction in this case between the constitutional standards applicable to a time, place, and manner restriction, and the balancing test described above for a regulation of speech unprotected as to minors that indirectly affects speech protected as to adults. In evaluating the display ban under either test, the crucial inquiry, at least in this case, is whether the restriction on adults' access to protected speech is unnecessarily burdensome or "significant," or, stated differently, whether alternate modes of adult access are unduly restricted.

*Id.* at 1502.

The overbreadth and vagueness doctrines are related yet distinct. *M.S. News Co.,* 721 F.2d at 1287.

The vagueness doctrine is anchored in the Due Process Clauses of the Fifth and Fourteenth Amendments, and pro-

tects against legislation lacking sufficient clarity of purpose and precision in drafting. *See Erznoznik v. City of Jacksonville,* [422 U.S. 205,] at 217–218, 95 S.Ct. [2268,] at 2276–77 [45 L.Ed.2d 125 (1975) ]; *Grayned v. City of Rockford,* 408 U.S. 104, 108–14 & n. 5, 92 S.Ct. 2294, 2298–302 & n. 5, 33 L.Ed.2d 222 and n. 5 (1972).

*Id.* (footnote omitted). The vagueness doctrine focuses on whether the law in question affords a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned,* 408 U.S. at 108–109, 92 S.Ct. at 2298–99. "Overbroad legislation need not be vague, indeed it may be too clear; its constitutional infirmity is that it sweeps protected activity within its proscription." *M.S. News Co.,* 721 F.2d at 1287 (citation omitted).

The overbreadth and vagueness doctrines are related in that "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment.... [since] ambiguous meanings cause citizens to " 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." " *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 6, 102 S.Ct. 1186, 1191 n. 6, 71 L.Ed.2d 362 (1982) (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964)); (in turn quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)).

*Id.* at 1505–06.

The parties have stipulated that: "There is, at present, land in Calhoun County, Alabama and elsewhere in the State of Alabama that is not within 1,000 feet of one of the protected uses set forth in Section 13A–12–200.5(4)." Further, that: "Act No. 98–467 does not operate as a "total taking" of the Plaintiff's property, and there are remaining economic uses to which the Plaintiff might subject its property presently housing the Platinum Club."

The court concludes that either under a time, place and manner analysis or a secondary effects analysis, section 13A–12–200.5 is

facially valid and is not overbroad.[9] The court will leave for another day any issues of inappropriate application.

The court ultimately concludes that both contested statutory provisions pass First Amendment muster. The plaintiff's complaint will be dismissed, with prejudice.

---

9. The emphasis on minors is certainly a reasonable emphasis.