3 A.3d 1268 (2010)
416 N.J. Super. 315
BOROUGH OF SAYREVILLE, Plaintiff-Respondent/Cross-Appellant,
v.
35 CLUB, L.L.C., a Limited Liability Company of the State of New Jersey, t/a XXXV Gentlemen's Club, 35 Club, and/or The XXXV Club, Defendant-Appellant/Cross-Respondent.
Nos. A-3537-08T1
Superior Court of New Jersey, Appellate Division.
Argued February 4, 2010.
Decided September 17, 2010.
*1270 Gregory W. Vella, Long Branch, argued the cause for appellant/cross-respondent (Collins, Vella & Casello, attorneys; Mr. Vella, on the brief).
Thomas A. Abbate argued the cause for respondent/cross-appellant (DeCotiis, Fitz-Patrick, Cole & Wisler, attorneys; Judy A. Verrone, Teaneck, of counsel; Mr. Abbate, on the brief).
Before Judges SKILLMAN, FUENTES and SIMONELLI.
The opinion of the court was delivered by
FUENTES, J.A.D.
Defendant 35 Club L.L.C., t/a XXXV Gentlemen's Club, 35 Club, and/or XXXV Club (Club 35) operated a sexually oriented business featuring live nude erotic dancing in the Borough of Sayreville in Middlesex County. This controversy began when the Borough filed a verified complaint in the Chancery Division against Club 35 alleging that the location and nature of Club 35's activities violated N.J.S.A. 2C:34-7 and the licensing requirements of the Borough's General Revised Ordinance Chapter VIII, Section 8-2.2. The Borough sought to permanently enjoin Club 35 from operating this business at this location.
*1271 The trial court held a six-day bench trial during which a number of fact and expert witnesses testified. Ultimately, the trial court granted the Borough's application and permanently enjoined Club 35 from operating its sexually oriented business at that location. The court also ordered this injunction to be recorded in the Office of the Middlesex County Registrar of Deeds as a restriction on the use of this property in perpetuity.
Club 35 now appeals, arguing that, in granting the Borough's application for injunctive relief, the trial court failed to consider and apply all of the factors outlined by our Supreme Court in Township of Saddle Brook v. A.B. Family Center, Inc., 156 N.J. 587, 722 A.2d 530 (1999). Club 35 further argues that even if an injunction is warranted under Saddle Brook, the court lacked the authority to impose a permanent and recordable deed restriction on the use of the property.
The Borough cross-appeals, arguing that the trial court erred in refusing to consider the internet as an alternative site for Club 35 to express its otherwise constitutionally protected activities. Specifically, the Borough argues that live interactive sexually oriented content delivered through mass media channels, such as the internet, should have been considered by the trial court as a reasonable alternative to the live nude dancing offered by Club 35.
Responding to Club 35's motion for interim relief, we stayed the trial court's injunction pending the outcome of this appeal. We now reverse the judgment of the trial court and remand this matter for the court to reconsider its ruling by applying all of the relevant factors outlined by the Court in Saddle Brook. Regardless of how the trial court rules on remand, however, we find no legal grounds for sustaining the court's order imposing a judicially crafted restriction on the use of this property that runs with the land in perpetuity. Finally, we reject the Borough's arguments in support of what it characterizes as a cross-appeal.[1]
Despite the voluminous record developed over the six day hearing, we limit our recitation to the facts necessary to address the issues raised by the parties on appeal.

I
In November 2007, Club 35 began operating an all nude gentlemen's club on Route 35 in Sayreville. Although the Club does not sell or otherwise dispense alcoholic beverages, customers are permitted to consume alcohol at the establishment if it was purchased off-site. It is not disputed that the Club qualifies as a "sexually oriented business" as defined by N.J.S.A. 2C:34-6(a)(2).[2] Given its location, it is equally undisputed that Club 35 violates N.J.S.A. 2C:34-7(a), which prohibits operating a sexually oriented business within 1000 feet of a public park and/or a residential zone.
That being said, the fact that Club 35's location, on its face, violates N.J.S.A. 2C:34-7(a) only begins the analysis required to determine whether such restrictions, as applied to Club 35, are constitutionally *1272 permissible. As the Court stated in Saddle Brook, supra, 156 N.J. at 596-97, 722 A.2d 530, "the statute's constitutionality as applied will depend on whether its application to [the sexually oriented business] allows adequate alternative channels of communication within the relevant market area." As the party seeking to enforce these restrictions, the Borough has the "burden of proving the adequacy of available alternative avenues of communications within the relevant market area." Id. at 597, 722 A.2d 530.
In an effort to meet its burden of proof, the Borough presented the testimony of Susan S. Gruel, a licensed professional planner. As a starting point, Gruel relied on the Urban Land Institute handbook "in order to evaluate and define the market area." Operating under the assumption that Club 35 was located in a "regional shopping center" area, Gruel used a twenty-minute drive-time test to determine the relevant market area. Gruel then drove twenty minutes from Club 35 on major transportation routes to determine the boundaries of the market area. Through this process, Gruel opined that the market area for Club 35 consisted of "all or portions of [sixty-five] municipalities in [five] counties in New Jersey and portions of Richmond County (Staten Island) in New York." This total market area encompassed approximately 303,997 acres with 1,477,100 residents, resulting in a population density of approximately 3,110 people per square mile.
After determining the relevant market area, Gruel identified a number of alternate sites that, in her view, were available to Club 35 for its relocation. In making this determination, Gruel first excluded any municipalities that prohibited sexually oriented businesses pursuant to local zoning restrictions. She then investigated the remaining areas to determine if either the buffering zone created by N.J.S.A. 2C:34-7 or other practical considerations prevented the particular location from being utilized as an alternative site. Gruel determined that "there were five municipalities, including Staten Island," that provided alternate sites for Club 35's business activities. She did not, however, "do a lot by lot assessment of all of the bulk standards," relying instead on "representative" or sample sites that, in her view, indicated "the character of the area." Consequently, Gruel opined that Newark had 953 available acres, Carteret had 189 available acres, Irvington had 12 available acres, Woodbridge had 776 available acres, and Staten Island had 1288 available acres for Club 35's business activities. In total, Gruel opined that there were 3,218 acres available to Club 35, or 1.06% of the 303,997 acres that comprised the market area.
Club 35 called Jason Kasler as its expert witness. He utilized "data provided by a similar client providing live entertainment... to aid in the definition of the primary market area."[3] Kasler used the Club 35 site as the starting point for his analysis; from this location, he used "concentric circles," representing population rather than percentage of available land, to determine the relevant market area. Kasler determined that Club 35's relevant market area "is roughly an 18-mile market area that extends outward" from Club 35. In the market area, he included municipalities that were more than fifty percent within the eighteen mile radius and excluded municipalities that were only partially within that radius. This area encompassed "666 square miles ... and 1.6 million people."
*1273 On the question of alternate available sites, Kasler, like Gruel, did not consider municipalities that prohibited sexually oriented businesses by ordinance.[4] He also eliminated areas falling within N.J.S.A. 2C:34-7's buffer zone. According to Kasler, his analysis identified only three alternate available sites in the relevant market area.
From this evidence, the trial judge upheld the constitutionality of N.J.S.A. 2C:34-7 as applied to Club 35. In an oral opinion delivered from the bench, the judge found both Gruel and Kasler credible witnesses. In his view, this case did not depend upon the credibility of the expert witnesses' testimony but on the ultimate reasonableness of their opinions. In this light, the judge characterized Gruel's approach as more conservative than Kasler's. The court also found Gruel's assessment of Club 35's market area more expansive, making her ultimate opinion more reasonable. Finally, after describing Kasler's testimony, the trial judge concluded that the Borough had met its burden of proof under Saddle Brook.

II
We are bound to accept the trial court's factual findings if they are supported by "adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). This deferential standard of review is tempered by the trial court's obligation to adhere to the requirements of Rule 1:7-4. Certain key facts are not disputed here, namely, that Club 35 is a sexually oriented business within the meaning of N.J.S.A. 2C:34-6 and that, given its location, operating such a business in its current location is prohibited by N.J.S.A. 2C:34-7. However, because Club 35's business activities constitute a constitutionally protected form of expression, the court must determine whether the restrictions in N.J.S.A. 2C:34-7, as applied to Club 35, are constitutionally permissible.
The trial court's responsibilities when evaluating an as applied challenge to N.J.S.A. 2C:34-7 were laid out by the Court in Saddle Brook. Distilled to its most basic elements, the Saddle Brook case requires trial courts to determine: (1) the relevant market area of the sexually oriented business; (2) the availability of alternative sites within the relevant market; and (3) whether the available sites, in relation to the size of the market area, provide enough suitable alternative sites for expression to comply with constitutional standards. Saddle Brook, supra, 156 N.J. at 597, 722 A.2d 530; see also Twp. of Cinnaminson v. Bertino, 405 N.J.Super. 521, 537, 966 A.2d 14 (App.Div.2009), certif. denied, 199 N.J. 516, 973 A.2d 384 (2009). The governmental entity seeking to uphold the statute bears the burden of proof under each factor of this test. Saddle Brook, supra, 156 N.J. at 597, 722 A.2d 530.
The first step in this analysis is for the court to identify the relevant market area. "[T]he relevant market area should include areas located in other municipalities within reasonable proximity to the [business's] location." Saddle Brook, supra, 156 N.J. at 597, 722 A.2d 530 (quotations and citations omitted). In determining what constitutes "within reasonable proximity," the court "may be informed by evidence of regional marketing patterns, availability of public transportation and access by automobiles, geographical distribution of customers at comparable sexually oriented businesses, and other factors *1274 deemed relevant by the parties and the court." Ibid.
Applying these principles to the facts presented, we cannot uphold the trial court's conclusion that the Borough met its burden of identifying Club's 35 relevant market area. The two experts did not address regional marketing patterns or available public transportation. Although Kasler included in his analysis customer profile data he obtained from another sexually oriented business, there is no indication that the data can be used to make any reasonable inferences about Club 35's clientele. In order to meet its burden of proof as to this criterion, the Borough needs to present competent expert testimony that tracks and responds to the elements identified by the Court in Saddle Brook on the question of Club 35's relevant market area.
These evidential deficiencies contributed to the court's inability to make clear factual findings demarcating the boundaries of the relevant market area. Once these deficiencies are addressed and rectified, the court needs to make specific findings, grounded in this evidence or the lack thereof, as to what constitutes Club 35's relevant market area.
We turn next to the question of whether the Borough identified available alternate avenues of communication within the relevant market area. A discussion of this criterion, of course, presumes the existence of an ascertainable market area. Because that determination is lacking here, our discussion of this issue will necessarily have a more abstract character.
In Saddle Brook, supra, 156 N.J. at 597, 722 A.2d 530, the Court held that determining "the availability of alternative sites necessarily will depend in part on the provisions of zoning ordinances enacted by neighboring municipalities that permit, prohibit, restrict or affect the feasibility of establishing sexually oriented businesses." The Court also noted that "[i]n addressing whether alternative sites for a protected activity should be considered in determining the availability of other adequate channels of communication, courts have focused on whether such sites are feasible alternatives and ... have de-emphasized the significance of higher costs in determining feasibility." Id. at 594-95, 722 A.2d 530.
Accordingly, the availability of alternate sites does not depend on whether the land is developed, occupied, or any other practical consideration that may present an inconvenience to its acquisition.
That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have the effect of suppressing, or greatly restricting access to, lawful speech,... we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices.
[Renton v. Playtime Theatres, Inc., 475 U.S. 41, 54, 106 S.Ct. 925, 932, 89 L.Ed.2d 29, 42 (1986).]
On the issue of the availability of alternative sites, we again cannot sustain the trial court's analysis and ultimate conclusion. The court's oral opinion does not discuss with any degree of particularity the various local zoning schemes that affect the availability of any given site. Indeed, when it included Staten Island as an "available site," the court admitted that it did not know what zoning laws govern land use in that locality or New York State as a whole.
*1275 The inclusion of Staten Island, however, presents an independent basis for rejecting the court's analysis with respect to the availability of suitable sites. The restrictions imposed by N.J.S.A. 2C:34-7 are the byproduct of the public policy position expressed by the elected representatives of the citizens of this State. These Legislators are answerable to those same citizens if, in their collective wisdom, they wish to amend or repeal that statute. Similarly, the local governing officials of Sayreville are answerable to the residents of that municipality, who likewise can express their collective opinion about the wisdom of local zoning laws that restrict this form of constitutionally protected expression.
However, neither the residents of Sayreville nor our State's citizens as a whole have an electoral voice in the affairs of Staten Island. The abridgment of constitutionally protected speech, no matter how seemingly unpopular or morally undesirable it may be, cannot be sustained when the alternative suitable sites for the expression of that speech are located outside the electoral reach of the people affected by such abridgement. As noted by Justice Blackmun in his concurring opinion in Schad v. Mount Ephraim, 452 U.S. 61, 78, 101 S.Ct. 2176, 2188, 68 L.Ed.2d 671, 686 (1981), "[w]ere I a resident of Mount Ephraim, I would not expect my right to attend the theater or to purchase a novel to be contingent upon the availability of such opportunities in `nearby' Philadelphia, a community in whose decisions I would have no political voice."
Our dissenting colleague finds no direct support for this proposition in any reported case. We likewise note that no reported decision that has addressed this issue has adopted the position the dissent advocates. In our view, the dissent's position opens the door for New Jersey to become an island of intolerance, requiring all those seeking freedom of expression to travel outside its borders.
We are thus compelled to remand for the court to scrutinize the record and identify what sites are available to Club 35 within the relevant market area. In addressing the concept of "availability," the court must consider local zoning restrictions as well the feasibility of the site. Renton, supra, 475 U.S. at 54, 106 S.Ct. at 932, 89 L.Ed.2d at 42.
Under Saddle Brook, the court must determine "whether the extent of the availability of alternative channels of communication, in relation to the size of the relevant market, is adequate to sustain the constitutionality of N.J.S.A. 2C:34-7 as applied to the [disputed] site." Saddle Brook, supra, 156 N.J. at 597, 722 A.2d 530. As we emphasized in Cinnaminson, supra, 405 N.J.Super. at 537, 966 A.2d 14, "what will be constitutionally sufficient will depend upon an exquisite exercise of judicial authority, guided by the fundamental principles embodied in the First Amendment." Thus, "five suitable sites within a ten-mile market area may be enough to satisfy constitutional concerns [while t]he same number of suitable sites within a fifty-mile market area may not be." Ibid.
Here, the court failed to make this constitutionally critical analysis. The issues previously discussed pertaining to the relevant market area and the suitability of sites within that area are the two predicate steps necessary for this ultimate analysis. Without this final determination, we cannot ascertain whether N.J.S.A. 2C:34-7, and the local zoning laws, leave a sufficient number of suitable alternative sites for the expression of this constitutionally protected form of expression.
Club 35 also challenges the trial court's ruling imposing a permanent and recordable deed restriction on the use of the property as part of the injunctive relief *1276 awarded to the Borough. This extraordinary impairment of the property's title is not authorized by N.J.S.A. 2C:34-7 or by the Borough's zoning laws. The trial court did not cite any other statutory authority or case law to support its decision, and the Borough has not identified any legal rationale for this determination in its brief before us. Without an express source of authority to support it, we are compelled to reverse the trial court's ruling imposing a permanent and recordable deed restriction on the use of the property.
Finally, we reject the Borough's so-called cross-appeal challenging the court's refusal to consider the internet as an alternative forum or site for Club 35 to conduct its sexually oriented business. In the view of many people, the live nude dancing experience offered by Club 35 cannot be completely replicated in cyberspace. Despite the great unexplored potential of the internet as a medium, including its interactive capabilities, it cannot yet, in such people's view, substitute for a live performance.
We thus reverse the trial court's order upholding the constitutionality of N.J.S.A. 2C:34-7 and the Borough's zoning restrictions as applied to plaintiff's sexually oriented business and remand for the court to apply the Saddle Brook factors consistent with this opinion. We do not retain jurisdiction.
SKILLMAN, P.J.A.D., concurring and dissenting.
I concur in the part of the majority opinion that reverses the judgment of the trial court and remands for reconsideration in light of the relevant factors set forth in Township of Saddle Brook v. A.B. Family Center, Inc., 156 N.J. 587, 722 A.2d 530 (1999). However, I dissent from the part of the opinion that directs the court to exclude Staten Island in its determinations of the relevant market area and the availability of adequate alternative sites for sexually-oriented businesses.
Initially, I note that the Court in Saddle Brook indicated that the adequacy of available alternative sites for the conduct of sexually-oriented businesses should be determined on a regional basis, without suggesting that the region must be confined to this State. See id. at 597, 722 A.2d 530. Moreover, the majority opinion in Schad v. Borough of Mount Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), does not suggest that there should be such a limitation in the relevant market area for the purpose of determining the availability of adequate alternative sites.
The only authority relied upon by the majority for limiting the relevant market area to New Jersey is Justice Blackmun's concurring opinion in Schad. However, Justice Blackmun's concurrence was not directed solely at the consideration of sexually-oriented businesses in other states; his reasons for concluding that a court should not consider the availability of alternative sites for sexually-oriented businesses in political subdivisions other than the one whose zoning ordinance is under attackin that case Mount Ephraim in Camden Countyare equally applicable to subdivisions in the same state. The critical paragraph of Justice Blackmun's concurrence relating to this issue states:
My other observation concerns the suggestion that a local community should be free to eliminate a particular form of expression so long as that form is available in areas reasonably nearby. In Mini Theatres[1] the Court dealt with locational restrictions imposed by a political subdivision, the [C]ity of Detroit, that preserved reasonable access to the regulated form of expression within the boundaries of that same subdivision. It *1277 would be a substantial step beyond Mini Theatres to conclude that a town or county may legislatively prevent its citizens from engaging in or having access to forms of protected expression that are incompatible with its majority's conception of the "decent life" solely because these activities are sufficiently available in other locales. I do not read the Court's opinion to reach, nor would I endorse, that conclusion.
[Id. at 77-78, 101 S.Ct. at 2187, 68 L.Ed.2d at 686.]
Although the following paragraph in Justice Blackmun's concurrence refers to Philadelphia as an example of a municipality in which a resident of Mount Ephraim "would have no political voice[,]" id. at 78, 101 S.Ct. at 2188, 68 L.Ed.2d at 686, his opinion does not suggest that a resident of Mount Ephraim would have any greater political voice in the zoning of other New Jersey municipalities than in Philadelphia's zoning. Therefore, if Justice Blackmun's concurrence had been endorsed by a majority of the Supreme Court, the determination of the availability of adequate alternative sites for sexually-oriented businesses would have to be confined to the same municipality or other political subdivision whose zoning was being attacked. However, the majority in Schad did not endorse that concurrence, and our Supreme Court held in Saddle Brook that the relevant market area for the purpose of determining the availability of such alternative sites may include other municipalities.
The Supreme Court has not considered Justice Blackmun's concurrence in Schad since its decision in that case, and no lower court has expressly considered Justice Blackmun's views concerning the availability of sexually-oriented businesses in political subdivisions other than the one whose zoning is under attack. Although there are a number of federal court cases that have confined consideration of available alternative sites for sexually-oriented businesses to the particular political subdivision whose zoning ordinance was under attack, those cases have involved either cities with substantial land area, including areas where sexually-oriented businesses were permitted, see, e.g., Seung Chun Lim v. City of Long Beach, 217 F.3d 1050, 1054-56 (9th Cir.2000); Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1531-33 (9th Cir.1993), cert. denied, 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994), or county-wide zoning under which sexually-oriented businesses were permitted in some parts of the county even though prohibited in the particular area in which the plaintiff sought to locate its business, see, e.g., Int'l Eateries of Am., Inc. v. Broward County, 941 F.2d 1157, 1165 (11th Cir.1991), cert. denied, 503 U.S. 920, 112 S.Ct. 1294, 117 L.Ed.2d 517 (1992); Ranch House, Inc. v. Amerson, 22 F.Supp.2d 1296 (N.D.Ala.1998), rev'd on other grounds, 238 F.3d 1273 (11th Cir. 2001).
In Keego Harbor Co. v. City of Keego Harbor, 657 F.2d 94 (6th Cir.1981), the court suggested in a footnote that the availability of sites in other nearby areas could be considered under some circumstances in passing upon the validity of an ordinance prohibiting sexually-oriented businesses, id. at 98 n. 4, but did not decide the issue because it found that the defendant had not presented sufficient evidence to justify its prohibition, id. at 98-99. Similarly, in Illinois One News, Inc. v. City of Marshall, 477 F.3d 461, 463-65 (7th Cir.2007), Boss Capital, Inc. v. Casselberry, 187 F.3d 1251, 1253-54 (11th Cir. 1999), cert. denied, 529 U.S. 1020, 120 S.Ct. 1423, 146 L.Ed.2d 315 (2000), and Phillips v. Borough of Keyport, 107 F.3d 164, 175 n. 4 (3rd Cir.1997) (en banc) the courts questioned whether it was appropriate to consider sites outside the political subdivision *1278 whose ordinance prohibiting or restricting sexually-oriented businesses was under attack, but declined to resolve the issue. Thus, Saddle Brook appears to be the only case that has squarely held that it is appropriate to consider the availability of sites for sexually-oriented businesses on a regional basis. See Matthew L. McGinnis, Sex, But Not the City: Adult-Entertaining Zoning, the First Amendment, and Residential Rural Municipalities, 46 B.C. L.Rev. 625, 647 (2005) (noting that Saddle Brook is the only case that has "definitively" determined that it is appropriate to consider sites beyond municipal boundaries in determining availability of adequate alternative sites for sexually-oriented businesses). Consequently, the decisions in other jurisdictions do not provide any significant assistance in determining whether the availability of sites for the conduct of sexually-oriented businesses outside the political subdivision whose ordinance is being challenged must be limited to in-state sites.
The Court in Saddle Brook held that the constitutionality of N.J.S.A. 2C:34-7 as applied depends on the "adequacy of alternative available sites" in the "relevant market area." 156 N.J. at 597, 722 A.2d 530. "[T]he relevant market area should include areas located in other municipalities `within reasonable proximity ...'" to the location in question. Ibid. A court's determination of this market area "may be informed by evidence of regional marketing patterns, availability of public transportation and access by automobiles, geographical distribution of customers at comparable sexually oriented businesses, and other factors deemed relevant by the parties and the court." Ibid. "The trial court's ascertainment of the availability of alternative sites necessarily will depend in part on the provisions of zoning ordinances enacted by neighboring municipalities that permit, prohibit, restrict or affect the feasibility of establishing sexually oriented businesses." Ibid.
I see no reason why a court's determination of the availability of alternative sites for the conduct of sexually-oriented businesses in the relevant market area, as required by Saddle Brook, should exclude sites in other states. A municipality seeking to defend the validity of its prohibition or restrictions upon the location of sexually-oriented businesses within its boundaries has the burden of demonstrating the existence of such sites. See id. at 597-98, 722 A.2d 530. The discharge of this burden would include presentation of evidence of any statute in the other state comparable to N.J.S.A. 2C:34-7[2] as well as whatever local zoning ordinance governs land uses in the out-of-state sites. If a municipality fails to present such evidence, it cannot rely upon an out-of-state site in defending its ordinance. However, if the municipality presents adequate evidence of the governing law and other satisfactory proof of the out-of-state site's availability for sexually-oriented businesses, I see no reason why that site should be barred from consideration in conducting the analysis required by Saddle Brook. Therefore, I dissent from the part of the majority opinion that imposes this constraint upon the trial court's consideration of alternative sites.
I also would give the trial court additional guidance concerning the determination whether "the extent of the availability of alternative channels of communication, in relation to the size of the market, is adequate to sustain the constitutionality of N.J.S.A. 2C:34-7 as applied[.]" Saddle Brook, supra, 156 N.J. at 597, 722 A.2d 530. Such guidance is provided by decisions of the federal circuit courts of appeals, which hold that the existence of *1279 adequate alternative sites for sexually-oriented businesses generally will be found if such sites are sufficient to accommodate all existing sexually-oriented businesses.
For example, the Fifth Circuit has explicitly adopted a bright line rule that "a zoning ordinance that provides fewer than the existing number of sites for adult businesses would not, as a matter of law, leave open ample alternative channels for communication of their erotic message." Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1309 (11th Cir.2003). "Under this test, an ordinance is constitutional only if '[a]s a matter of arithmetic ... there are more "reasonable" sites available than businesses with demands for them.'" Ibid. (quoting Lakeland Lounge of Jackson, Inc. v. City of Jackson, 973 F.2d 1255, 1260 (5th Cir.1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993)); accord Buzzetti v. City of New York, 140 F.3d 134, 141 (2d Cir.) (finding ordinance unconstitutional unless it permits "all the City's existing adult establishments to continue to operate in the City, either at their current sites or at new locations") cert. denied, 525 U.S. 816, 119 S.Ct. 54, 142 L.Ed.2d 42 (1998); Woodall v. City of El Paso, 49 F.3d 1120, 1127 (5th Cir.1995) (finding it sufficient that "there were at all relevant times more `reasonable' sites available than businesses with demands for them" and stating that the burden was on the business to refute this), cert. denied, 516 U.S. 988, 116 S.Ct. 516, 133 L.Ed.2d 425 (1995); Topanga Press, supra, 989 F.2d at 1532-33 (invalidating adult business zoning ordinance where the total number of adult businesses that could coexist was fewer than the number of adult businesses already operating at the time the ordinance was enacted); Walnut Props., Inc. v. City of Whittier, 861 F.2d 1102, 1104 (9th Cir.1988) (striking down an ordinance that allowed only three of thirteen sexually-oriented businesses to continue operating), cert. denied, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989); Int'l Eateries of Am., supra, 941 F.2d at 1165 (ordinance allowed reasonable alternative avenues of communication because twenty-six other sites in county could accommodate plaintiff's nude dancing establishment).
I also note that our Supreme Court relied upon International Eateries, Woodall, Topanga Press and Walnut Properties, in establishing its framework for determining the extent of availability of alternative sites for sexually-oriented businesses. Therefore, I believe the trial court may properly consider this line of federal authority in determining the availability of adequate alternative channels of communication, in relation to the size of the market.
NOTES
[1] As a respondent, the Borough can raise alternative arguments in support of the trial court's judgment without filing a cross-appeal. Chimes v. Oritani Motor Hotel, Inc., 195 N.J.Super. 435, 443, 480 A.2d 218 (App.Div. 1984).
[2] N.J.S.A. 2C:34-6(a)(2) defines "sexually oriented business" as "[a] commercial establishment which regularly features live performances characterized by the exposure of a `specified anatomical area' or by a `specified sexual activity,' or which regularly shows films, motion pictures, video cassettes, slides, or other photographic representations which depict or describe a `specified sexual activity' or `specified anatomical area.'"
[3] See D. Russo, Inc. v. Romankow, No. A-0633-08T1, 2010 WL 3720292 (App.Div. Sept. 17, 2010), an unpublished opinion decided at the same time we decide this appeal, addressing the same issues raised here.
[4] Kasler's analysis of local zoning laws also excluded sites that were not zoned for commercial use or only permitted commercial establishments as a conditional use.
[1] Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).
[2] Our research did not reveal any such statute.