33 A.3d 1200

BOROUGH OF SAYREVILLE, PLAINTIFF–APPELLANT, v. 35 CLUB, L.L.C., A LIMITED LIABILITY COMPANY OF THE STATE OF NEW JERSEY, T/A XXXV GENTLEMEN'S CLUB, 35 CLUB, AND/OR THE XXXV CLUB, DEFENDANT–RESPONDENT.

Argued September 12, 2011—Decided January 19, 2012.

*Kerry E. Higgins* argued the cause for appellant (*McKenna, DuPont, Higgins & Stone,* attorneys); *Judy A. Verrone* and *Thomas A. Abbate,* on the briefs (*DeCotiis, Fitzpatrick & Cole,* attorneys).

*Gregory W. Vella* argued the cause for respondent (*Collins, Vella & Casello,* attorneys).

*Edward L. Barocas,* Legal Director, submitted a brief on behalf of amicus curiae American Civil Liberties Union of New Jersey Foundation (*Mr. Barocas,* attorney; *Mr. Barocas* and *Jeanne M. LoCicero,* on the brief).

Justice HOENS delivered the opinion of the Court.

█ The First Amendment to the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution provide strong protections to our rights of free speech. So greatly do we in New Jersey cherish our rights of free speech that our Constitution provides even broader protections than the familiar ones found in its federal counterpart. In preserving and advancing those broad constitutional commands, we have been vigilant, jealously guarding the rights of the people to exercise their right to "freely speak," *N.J. Const.* art. I, par. 6, although their message may be one that is offensive to some, or even to many, of us.

■ So universally accepted are these principles that we need not address in any detail their application to the dispute now before this Court. Rather, we accept as part and parcel of our established body of law that free speech, and its related right, free expression, apply so as to protect the rights of individuals and entities to establish and operate sexually-oriented businesses as well as the rights of the individuals who choose to patronize those businesses.

As precious as our rights of free speech and free expression undoubtedly are, however, they are neither absolute nor unbounded. In particular, as it relates to sexually-oriented businesses, our Legislature has enacted a statute that limits the places in our State where such businesses may operate, *see N.J.S.A.* 2C:34-7, and many municipalities have taken steps, consistent with that statute, to use their zoning power to direct such businesses to operate in one or another area within their borders.

The statute that sets forth the Legislature's regulatory scheme for such businesses, *N.J.S.A.* 2C:34-7, has previously been sustained by this Court against a direct facial challenge to its constitutionality, *see Hamilton Amusement Ctr. v. Verniero,* 156 *N.J.* 254, 262, 716 *A.*2d 1137 (1998), *cert. denied,* 527 *U.S.* 1021, 119 *S.Ct.* 2365, 144 *L.Ed.*2d 770 (1999). Thereafter, this Court fixed the parameters that inform both the enforcement of the statute and the basis on which an as-applied constitutional challenge to it must be measured. *See Twp. of Saddle Brook v. A.B. Family Ctr., Inc.,* 156 *N.J.* 587, 722 *A.*2d 530 (1999). That is, we held that the statute's ban on locating or operating sexually-oriented businesses within 1,000 feet of certain identified areas or uses is constitutional, but we also recognized that because the statute operates to limit free speech rights being exercised by the owners and patrons of such establishments, it can only do so if there are adequate alternative channels of the communication of this type of speech. *Id.* at 596-97, 722 *A.*2d 530.

It is in this larger context that this appeal comes before this Court. An appeal as of right brought to us by virtue of a dissent

in the Appellate Division, this matter raises a single, narrow inquiry. Simply put, the question is whether a court may consider, as part of its determination of an as-applied challenge to the statute's constitutionality, the availability of alternative channels of communication that are located in another state. That is, the issue is whether an expert called to identify alternative channels of this form of communication may, as part of the evaluation of the relevant market area, include sites that are located outside of our State's borders and whether the trial court may consider those sites in deciding the as-applied challenge.

In answering that inquiry, our response is equally narrow. We hold that in evaluating the adequacy of alternative channels of communication, our trial courts are not precluded from considering the existence of sites that are located outside of New Jersey but that are found within the relevant market area as defined by the parties' experts. In reaching this conclusion, we do not suggest that a market area analysis that finds alternative channels of communication only outside of our borders will ever be sufficient to withstand an as-applied challenge.[1] Nor, for that matter, would we permit a market area analysis in which the majority of the alternative channels of communication are found in our neighboring states to suffice for this purpose. We hold only that in analyzing the adequacy of the alternative channels of communication, the trial court may consider that the relevant market area includes some sites located outside of this State's borders.

### I.

The facts that are relevant to this dispute were compiled during a six-day bench trial, but that record can be summarized briefly for purposes of the narrow issue raised in this appeal.

---

[1] Notwithstanding the concern expressed by the dissent that our holding in some fashion will permit municipalities to "restrict the location of sexually oriented expression without providing that expression a safe haven somewhere within this State's borders," *ante* at 513, 33 *A.*3d at 1213, the limited permission to consider sites elsewhere is simply part of a regional approach.

In November 2007, defendant 35 Club L.L.C. began operating a business called "XXXV Gentlemen's Club" in the Borough of Sayreville. The business has been described as an "all-nude gentlemen's cabaret" and therefore is one which meets the statutory definition of a sexually-oriented business. *See N.J.S.A.* 2C:34–6(a). Shortly after the business opened, plaintiff, the Borough of Sayreville, commenced a Chancery Division action seeking declaratory relief. In part, the Borough sought to permanently enjoin defendant from operating its business at the location it had chosen because that location violated the statute that prohibits the operation of a sexually-oriented business within 1,000 feet of a public park or residential zone. *N.J.S.A.* 2C:34–7(a).

Because defendant conceded that the Club's location violated the statutory prohibition, the issue that was presented to the trial court revolved around whether the statute's restriction could constitutionally be applied to defendant's business. That issue required the parties, and the trial court, to consider and apply the analytical framework for an as-applied challenge to the statute devised by this Court. *See Saddle Brook, supra,* 156 *N.J.* at 596–97, 722 *A.*2d 530. That analytical framework rests on a determination of whether there are "adequate alternative channels of communication [for the protected activity] within the relevant market area." *Id.* at 597, 722 *A.*2d 530.

The trial court's analysis of the adequacy of alternative avenues of communication turned on its evaluation of the competing theories offered by the experts called by the two parties. The Borough offered expert testimony from Susan S. Gruel, P.P., who is a licensed professional planner with twenty-five years of experience and an adjunct professor at Rutgers University. Gruel began by establishing the relevant market area. She reasoned that a sexually-oriented business is analogous to a regional shopping center because both are considered to be regional establishments or businesses. She therefore based her analysis on a geographic area within a twenty-minute drive from the location where defendant's place of business had been opened, relying on

the Urban Land Institute's *Shopping Center Development Handbook* (3d ed. 1999). That process generated a market area comprised of 303,997 acres of property where 1.47 million people live. Gruel's proposed geographic market covered all or part of sixty-five municipalities that are located in five New Jersey counties and in part of New York's Staten Island.

Gruel then applied a series of principles to determine the availability of alternative sites within the market area she had identified. First, she examined the zoning ordinances of all sixty-five municipalities in the market area and eliminated those that did not have a zoning ordinance expressly permitting sexually-oriented businesses. Second, she used zoning maps of the remaining municipalities to identify zones where sexually-oriented businesses were either permitted uses or conditionally permitted uses. Third, she conducted site visits to the areas in those municipalities where such a business would be a conditional use so that she could identify and plot locations that complied with both the statutory 1,000–foot buffer requirement and any additional buffer requirements set forth in local ordinances. For this aspect of her analysis, she used tax maps, aerial photography, and digital map data as guides. Finally, she excluded areas that were not reasonably part of the general real estate market, including natural bodies of water, rights of way, and public property.

Using this methodology, Gruel identified 3,218 acres in five municipalities that she considered to be well-suited for a business such as defendant's. Analyzing the areas by municipality, Gruel determined the available area for a business like defendant's included: (1) 953 acres in Newark; (2) 189 acres in Carteret; (3) twelve acres in Irvington; (4) 776 acres in Woodbridge; and (5) 1,288 acres in Staten Island.

Finally, Gruel identified existing sexually-oriented businesses where live nude dancing was currently offered, including one in Sayreville that is within a five-minute drive from defendant's site and which, unlike defendant's chosen location, complies fully with all statutory and zoning requirements.

Defendant called licensed professional planner Jason Kasler, P.P., as its expert. Kasler used a population-based methodology to identify the relevant market area. Based upon customer attendance and zip code data collected from two live nude clubs that were in operation elsewhere in New Jersey, he determined that the relevant market area could be created by using an eighteen-mile wide circle. When transposed onto defendant's present location, that market analysis generated a relevant area of 666 square miles, where 1.6 million people live in sixty-five municipalities.

In making his availability findings, Kasler used an approach that was somewhat different from Gruel's. First, he looked at municipalities in the market area to determine which ones had an ordinance governing the location of sexually-oriented businesses, excluding from further consideration any town that banned them entirely. Second, focusing on those towns that had an ordinance that permitted sexually-oriented businesses, Kasler looked to determine if there was any available land after applying the statutory buffers and, if so, whether any such site was a reasonable alternative as he defined it. Third, he excluded any site that was not in a retail-oriented zone and any site that was not of a size and in a location capable of sustaining a business similar in size to defendant's Club. Fourth, he excluded any "partial" sites, meaning any parcel of land, regardless of how large, if any portion of it, regardless of how small, was within 1,000 feet of any statutorily buffered use.

Applying this methodology, Kasler concluded that none of the properties identified by the Borough's expert was genuinely available. He excluded Carteret and Woodbridge because their zoning ordinances only conditionally permitted sexually-oriented businesses. He excluded Newark and Irvington because more than half of their land mass was outside the eighteen-mile market area circle he used. He also excluded Staten Island based on unspecified "legal advice" that he was given. Using his analysis, Kasler found only three alternative sites available for a sexually-oriented

business, none of which had been suggested by the Borough's expert Gruel. Those sites consisted of a parcel in Piscataway located on a commercial highway and two parcels of vacant land adjacent to Route 33 in Monroe Township.

At the close of evidence, the Chancery Division concluded that the Borough had carried its burden of demonstrating, by a preponderance of the evidence, the availability of adequate alternative channels of communication within the market area relevant to defendant's business. Accordingly, the trial court rejected defendant's as-applied constitutional challenge to the statute, *N.J.S.A.* 2C:34–7, and ordered defendant to discontinue operating its sexually-oriented business at the location it had chosen in Sayreville.

In supporting its conclusion, the Chancery Division analyzed each expert's testimony and methodology to determine which provided a more reasonable analytical framework for identifying the alternative channels of communication. Essentially concluding that Kasler's approach, and therefore his conclusions, were flawed, the Chancery Division found Gruel's more expansive approach to the relevant market area to be the more reasonable one. The Chancery Division explained that "casting a wider net" was particularly appropriate because sexually-oriented businesses were statutorily disfavored and, in fact, are disallowed unless the criteria established by this Court are met. *See Saddle Brook, supra,* 156 *N.J.* at 596–97, 722 *A.*2d 530.

Of particular relevance to this appeal, the Chancery Division also discussed each expert's treatment of the municipalities in the relevant market area. Finding Kasler's exclusion of any and all sites in Staten Island to be without justification, the Chancery Division reasoned that Staten Island was "no different than any other site in the market area . . . except for a bridge and a toll." The Court concluded that including sites in New York, although they would potentially require the business to navigate another state's land use regulations, was reasonable in light of the fact that New Jersey's municipalities have different land use regulations.

The Appellate Division, for reasons expressed in the decision of its majority, reversed and remanded for reconsideration in light of the factors outlined by this Court in *Saddle Brook*. *Borough of Sayreville v. 35 Club, L.L.C.*, 416 *N.J.Super.* 315, 3 *A.*3d 1268 (App.Div.2010). As that court observed, "because [defendant's] business activities constitute a constitutionally protected form of expression, the court must determine whether the restrictions in *N.J.S.A.* 2C:34–7, as applied to [defendant's business], are constitutionally permissible." *35 Club, supra,* 416 *N.J.Super.* at 324, 3 *A.*3d 1268.

The Appellate Division noted that the trial court's responsibilities for evaluating an as-applied challenge to the statute are those that were laid out by this Court in *Saddle Brook. Ibid.* Distilling *Saddle Brook* to its most basic elements, the majority found that a trial court must determine: "(1) the relevant market area of the sexually-oriented business; (2) the availability of alternative sites within the relevant market; and (3) whether available sites, in relation to the size of the market area, provide enough suitable alternative sites for expression to comply with constitutional standards." *Ibid.* (citing *Saddle Brook, supra,* 156 *N.J.* at 597, 722 *A.*2d 530).

With these factors as its guide, the Appellate Division analyzed the Chancery Division's decision as it related to the identification of the relevant market area. *Ibid.* In the majority's view, the Borough failed to satisfy its burden of identifying defendant's relevant market area. *Ibid.* The majority noted that in order to meet the burden of proof that this Court established in *Saddle Brook*, the Borough was required to present competent expert testimony that tracks and responds to the elements identified by this Court on the question of defendant's relevant market area. *Id.* at 324–25, 3 *A.*3d 1268. Because "[t]he two experts did not address regional marketing patterns or available public transportation," the Appellate Division held that the expert proofs fell short of the elements that this Court had established. *Ibid.*

Turning to the question of whether the Borough identified available alternate sites within the relevant market area, the majority faulted the trial court for failing to "discuss with any degree of particularity the various local zoning schemes that affect the availability of any given site." *Id.* at 326, 3 *A.*3d 1268. As part of that criticism, the majority noted that the Chancery Division included Staten Island as an available site, even though conceding that there was no information in the record about what zoning laws govern land use in that locality or in New York State as a whole. *Ibid.*

Although the majority of the appellate panel thus faulted the findings and conclusions of the Chancery Division on both of these grounds generally, it commented that "[t]he inclusion of Staten Island [in the relevant market area] presents an independent basis for rejecting the [Chancery] court's analysis with respect to the availability of suitable sites." *Ibid.* That conclusion rested on the majority's observation that "the restrictions imposed by *N.J.S.A.* 2C:34–7 are the byproduct of the public policy position expressed by the elected representatives of the citizens of this State." *Ibid.* As such, "neither the residents of Sayreville nor our State's citizens as a whole have an electoral voice in the affairs of Staten Island." *Ibid.* The panel's majority found support for its argument in a concurring opinion by Justice Blackmun in another matter concerning businesses of this type, in which he observed "[w]ere I a resident of Mount Ephraim, I would not expect my right to attend the theater or to purchase a novel to be contingent upon the availability of such opportunities in 'nearby' Philadelphia, a community in whose decisions I would have no political voice." *Id.* at 326–27, 3 *A.*3d 1268 (quoting *Schad v. Mount Ephraim*, 452 *U.S.* 61, 78, 101 *S.Ct.* 2176, 2188, 68 *L.Ed.*2d 671, 686 (1981) (Blackmun, J., concurring)).

The majority of the appellate panel criticized the dissent's contrary view about the permissibility of including consideration of sites in Staten Island, asserting that it "opens the door for New Jersey to become an island of intolerance, requiring all those

seeking freedom of expression to travel outside its borders." *Id.* at 327, 3 *A.*3d 1268. Accordingly, the majority remanded the matter for the Chancery Division to review the record and identify available sites to defendant within the relevant market area, considering only local zoning restrictions and the feasibility of the site, and limiting consideration to sites in New Jersey. *Ibid.*

Judge Skillman, the dissenting member of the panel, had a different view about whether the relevant geographic area for purposes of evaluating alternative channels of communication could include sites in Staten Island. Observing that the guiding precedent from this Court rested on a regional analysis, with no suggestion that the region to be considered is or should be confined by our State's borders, *id.* at 329, 3 *A.*3d 1268 (Skillman, P.J.A.D., dissenting) (citing *Saddle Brook, supra,* 156 *N.J.* at 597, 722 *A.*2d 530), he criticized the majority for relying on Justice Blackmun's concurrence when the United States Supreme Court's majority had not suggested such a limitation on the relevant market area, *id.* at 330–32, 3 *A.*3d 1268.

## II.

This matter comes to us as an appeal as of right, arising only through the dissent in the Appellate Division. *R.* 2:2–1(a)(2). As such, our review is confined to the issue which was the subject of the dissent, *ibid.,* no other matter having been brought to us through a petition for certification, *see State v. Allegro,* 193 *N.J.* 352, 371 n. 9, 939 *A.*2d 754 (2008) (holding that "[a] notice of appeal based on a dissent in the Appellate Division preserves for review only those issues on which the dissent was filed, and certification must be sought separately as to all other issues"); *accord, Aversano v. Palisades Interstate Parkway Comm'n.,* 180 *N.J.* 329, 332, 851 *A.*2d 633 (2004). That is, "where there is a dissent in the Appellate Division, the scope of the appeal (absent other considerations) is limited to those issues encompassed by the dissent." *Gilborges v. Wallace,* 78 *N.J.* 342, 349, 396 *A.*2d 338 (1978).

In this appeal, therefore, our review is limited to a single point of dispute. Simply put, the issue identified in the dissent is solely whether a trial court addressing an as-applied challenge to the statute may consider potentially available alternative sites that are outside of our State's borders.[2] Our consideration of that question requires a review of the statute's history and purposes in the context of the constitutional protections offered to businesses like this one.

### A.

■ Much of the history of the law relating to sexually-oriented businesses can be summarized succinctly. As a general proposition, adult-oriented forms of expression are entitled to the protections afforded by the First Amendment. *See, e.g., Smith v. California,* 361 *U.S.* 147, 150, 80 *S.Ct.* 215, 217, 4 *L.Ed.*2d 205, 209 (1959) (concluding that adult bookstores are protected); *Southeastern Promotions, Ltd. v. Conrad,* 420 *U.S.* 546, 552, 95 *S.Ct.* 1239, 1243, 43 *L.Ed.*2d 448, 455 (1975) (concluding that live adult-themed theater performances are protected); *Schad, supra,* 452 *U.S.* at 66, 101 *S.Ct.* at 2181, 68 *L.Ed.*2d at 678 (concluding that non-obscene nude dancing is protected).

■ Of more relevance to the issue raised in this appeal, the United States Supreme Court has considered challenges to ordinances that regulate the locations where businesses of this type may be conducted through the creation of buffer zones and has sustained such ordinances as consistent with the protections afforded by the First Amendment. As the United States Supreme Court noted in *Young v. American Mini Theatres, Inc.,* 427 *U.S.* 50, 96 *S.Ct.* 2440, 49 *L.Ed.*2d 310 (1976), adult entertainment zoning is an example of a statute in which the value of free speech

---

[2] The Borough's brief on appeal includes numerous arguments related to some of the issues it raised at the Chancery Division and on appeal other than the single issue addressed in the dissent. As neither party sought certification on any other issue, we need not recite them.

and public debate must be balanced against the arguably artistic value of some erotic material. *Id.* at 70, 96 *S.Ct.* at 2452, 49 *L.Ed.*2d at 326; *see also City of Renton v. Playtime Theatres, Inc.,* 475 *U.S.* 41, 47, 106 *S.Ct.* 925, 928, 89 *L.Ed.*2d 29, 37 (1986). As the Court has held, because such ordinances limit the expressive activity and do not ban it entirely, they are appropriately analyzed as time, place and manner regulations. *Am. Mini Theatres, supra,* 427 *U.S.* at 63 & n. 18, 96 *S.Ct.* at 2448–49 & n. 18, 49 *L.Ed.*2d at 321–22 & n. 18; *id.* at 78–79, 96 *S.Ct.* at 2456, 49 *L.Ed.*2d at 331 (Powell, J., concurring).

Following its pronouncement about the manner in which such ordinances are to be evaluated, the Court invalidated a municipal ordinance that had been adopted here in New Jersey because it prohibited all forms of live adult entertainment, including non-obscene nude dancing. *Schad, supra,* 452 *U.S.* at 74, 101 *S.Ct.* at 2185–86, 68 *L.Ed.*2d at 684. The Court acknowledged the municipality's position that a countywide analysis could make it permissible to allow entertainment only in selected areas, but declined to consider its implications because there was no such countywide scheme. *Ibid.* In that context, however, the Court commented that it was unable to consider whether the ordinance could be sustained if there were evidence to support the proposition that the kind of entertainment appellants wish to provide is available in reasonably nearby locations. *Id.* at 76–77, 101 *S.Ct.* at 2186–87, 68 *L.Ed.*2d at 685.

In its seminal opinion on the subject, the United States Supreme Court concluded that for analytical purposes such ordinances are considered to be content neutral, because they do not prohibit these businesses, but instead are "designed to prevent crime, protect the city's retail trade, [and] maintain property values," thereby aiming to preserve quality of life in the communities that adopt them. *Renton, supra,* 475 *U.S.* at 48, 106 *S.Ct.* at 929, 89 *L.Ed.*2d at 38. As the Court commented, "at least with respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary

effects of such businesses are to be reviewed under the standards applicable to content-neutral time, place, and manner regulations." *Id.* at 49, 106 *S.Ct.* at 929–30, 89 *L.Ed.*2d at 38–39 (citing *Am. Mini Theatres, supra,* 427 *U.S.* at 70, 96 *S.Ct.* at 2452, 49 *L.Ed.*2d at 326). In the Court's evaluation, the harmful secondary effects of sexually-oriented businesses to be considered include crime, reduction of other economic activity and lower property values. *See id.* at 47–49, 106 *S.Ct.* at 929–30, 89 *L.Ed.*2d at 37–39.

As the Court also held, in reviewing an ordinance imposing buffers around such businesses, "[t]he appropriate inquiry ... is whether the ... ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." *Id.* at 50, 106 *S.Ct.* at 930, 89 *L.Ed.*2d at 39. Because the Court had previously concluded that the "interest in attempting to preserve the quality of urban life is one that must be accorded high respect," *Am. Mini Theatres, supra,* 427 *U.S.* at 71, 96 *S.Ct.* at 2453, 49 *L.Ed.*2d at 327, and because it has also rejected challenges to the use of buffers to effectuate this goal, see *Renton, supra,* 475 *U.S.* at 53–54, 106 *S.Ct.* at 931–32, 89 *L.Ed.*2d at 41–42, the focus of the inquiry, of necessity, is on whether enforcing the ordinance allows for reasonable alternative avenues of communication. *Ibid.*

In *Renton,* the Court offered some guidance on this aspect of the inquiry. Rejecting arguments that the land identified as potentially available as an alternative avenue of communication was not for sale or lease and that there were no commercially viable alternate sites, the Court observed that the First Amendment is not offended by the fact that the business owners will be required to compete with other potential purchasers or lessors. *Id.* at 54, 106 *S.Ct.* at 932, 89 *L.Ed.*2d at 42. That the owner of a sexually-oriented business will face some difficulty in securing an alternate site merely places that business on an equal footing with other potential users. In the United States Supreme Court's view, as long as the ordinance does not effectively deny a reasonable opportunity to open and operate the business, the First

Amendment's protections have been sufficiently safeguarded. *Ibid.*

### B.

Our Legislature enacted the statute that is the basis for the municipal ordinance challenged in this appeal, *N.J.S.A.* 2C:34–7, after the United States Supreme Court's decision in *Schad.* As a result, in contrast to all of the cases in which that Court has spoken on this issue, we consider this appeal in the context of New Jersey's statewide statutory restriction on the location of sexually-oriented businesses. The statute requires that there be a 1,000–foot buffer between a sexually-oriented business and

> any existing sexually oriented business, or any church, synagogue, temple or other place of public worship, or any elementary or secondary school or any school bus stop, or any municipal or county playground or place of public resort and recreation, or any hospital or any child care center, or within 1,000 feet of any area zoned for residential use.
>
> [*N.J.S.A.* 2C:34–7 (a).]

The general purpose of the statute, as described by the sponsor, is to "regulate the operations and locations of sexually-oriented businesses" by disallowing their placement within 1,000 feet of certain enumerated sites including schools, public parks, and places of worship. Sponsor's Statement, *Statement to Assembly Bill No. 252* (Dec. 15, 1994).

As this Court has noted, in enacting this statute "the Legislature did not [intend to] outlaw sexually-oriented businesses, but [instead] permitted" them in certain locations. *D.E.G., L.L.C. v. Twp. of Fairfield,* 198 *N.J.* 242, 265, 966 *A.*2d 1036 (2009). The Legislature made that permission explicit by including in the statute a provision that authorizes any municipality to create a zoning scheme that is less restrictive than what the statute requires. *Ibid.* As such, the statute provides: "Nothing contained ... [in *N.J.S.A.* 2C:34–7] shall be construed to prohibit a municipality from adopting as a part of its zoning ordinances an ordinance permitting the sale, distribution, rental or exhibition of obscene material in which event such sale, distribution, rental or

exhibition shall be deemed legal." *N.J.S.A.* 2C:34–2(b). As the sponsor explained, "[n]otwithstanding this provision, municipalities could still choose to adopt zoning ordinances establishing so called 'combat' zones for the clustering of sexually oriented businesses." *Statement to Assembly Bill No. 252, supra.* Accordingly, the statute authorizes a standard, but leaves municipalities free to choose whether to follow it or to enact other, more lenient ordinances.

Our statute has withstood a facial constitutional challenge, *Hamilton Amusement, supra,* 156 *N.J.* at 262, 716 *A.*2d 1137 (concurring in Appellate Division's constitutional analysis), and this Court has held that the statute is instead subjected to an as-applied challenge. The result, therefore, is that constitutionality is tested in accordance with any ordinances adopted by municipalities in which the statute's operation is defined. *Saddle Brook, supra,* 156 *N.J.* at 596–97, 722 *A.*2d 530.

Our statewide approach to regulating these businesses undergirds the conclusion in *Saddle Brook* that the analysis of alternative avenues of communication demands a regional approach. Unlike all of the cases considered by the United States Supreme Court, in which a single municipality adopted a buffer zone, and in which the only appropriate focus was on whether there were alternatives within that municipality, *see, e.g., Renton, supra,* 475 *U.S.* at 43, 106 *S.Ct.* at 35, 89 *L.Ed.*2d at 926 (considering ordinance in Renton, Washington); *Schad, supra,* 452 *U.S.* at 62, 101 *S.Ct.* at 2179, 68 *L.Ed.*2d at 676 (considering ordinance in Mount Ephraim, New Jersey); *Am. Mini Theatres, supra,* 427 *U.S.* at 52, 96 *S.Ct.* at 2443, 49 *L.Ed.*2d at 315 (considering ordinance in Detroit, Michigan), our statute has always required a different approach. Although consideration of sites beyond a particular municipality's borders was not directly relevant to any of the matters decided by the United States Supreme Court, nothing in any of the Court's opinions would preclude it. More to the point, our Legislature's statewide approach demands that any

ordinance be tested by means of a regional market rather than be confined to the borders of any particular municipality.

The question now before this Court is whether a trial court, in evaluating whether there are sufficient alternative avenues of communication to sustain a municipality's refusal to permit such a business to operate at a particular site, may consider a relevant market that includes alternatives that are located in a neighboring state. Our conclusion that sites in a neighboring state may indeed be considered for this purpose rests on several grounds.

First, as a practical matter, it may be far more convenient for a patron to travel a few minutes into New York or Pennsylvania than to travel twenty minutes away to Newark or Elizabeth. For a person living close to one of our State's borders, the trip into another state may be preferable to driving on a highway or riding a bus or train to a more distant location within New Jersey. One who lives, for example, in the shadow of the Goethals Bridge might find a site in Staten Island more easily accessible than a trip up Routes 1 and 9 to patronize a like establishment in Newark, Union or Elizabeth. Such a patron might equally find a short trip to Staten Island preferable to the routes south on the New Jersey Turnpike or the Garden State Parkway that could be used to access defendant's preferred location in Sayreville. Our citizens regularly cross into our neighboring states for employment opportunities and entertainment of other kinds, making an analysis that would preclude any consideration of sites in those states unnecessarily restrictive in light of the behavior of our modern mobile populace.

Second, as the record on appeal makes plain, patrons of businesses like defendant's often travel from and to states other than the ones in which they reside to access this sort of entertainment. The data collected by defendant's expert, which included an analysis of the zip codes provided by patrons of a similar establishment in the northern part of our State, demonstrates that this is so. That data suggests that confining our review only to poten-

tially available locations within our borders may not comport with the manner in which individuals in fact exercise the rights that the First Amendment protects.

Third, when this Court announced its rule for the evaluation of such ordinances in *Saddle Brook*, we intentionally adopted a regional approach to the relevant market. We recognized that in the context of a statewide statute, our trial courts could look beyond the borders of any particular municipality and consider on a broader scale whether there were adequate alternate avenues for the operation of one of these business establishments. That approach, inevitably, rests on expert opinions from professional planners[3] who can analyze relevant criteria to define the market and evaluate the available alternatives, forming the record on which our trial courts may then reach their conclusions. By expressly adopting a regional approach, this Court recognized that the evaluation of alternative avenues would inevitably rest on the opinions of experts, and therefore left to them, at least in part, the question of how such a region would be defined.

Fourth, refusing to permit any consideration of locations that are found in nearby states would result in unequal treatment among our municipalities themselves. A town in the middle of our State would be able to use a wide market area comprised of many other places in New Jersey, taking full advantage of the analytical framework this Court established in *Saddle Brook*. A town on one of our State's borders, however, would find that the regional market approach that we created to be artificially truncated, potentially requiring our border municipalities to host far more businesses of this type than would otherwise be the case. We do

---

[3] It is significant in this regard that defendant's professional planner did not exclude municipalities from his eighteen-mile circle that were beyond the borders of our State for any reason relating to a planner's ordinary or customary methodology or analysis. Instead, he did so only because of "legal advice." Absent some reason based in his professional training or education as to why communities in Staten Island would be irrelevant to his analysis, we presume that he would have considered them, as did the Borough's expert planner.

not perceive in the statute any intent of our Legislature to treat municipalities differently based on happenstance nor do we conclude that anything in our free speech or free expression jurisprudence so requires.

Finally, the suggestion that our courts cannot consider sites beyond our borders in evaluating whether there are adequate alternate avenues of communication because the operators of these businesses have no voice in the government of municipalities in our neighboring states ignores the fact that they have no more voice in the government of other municipalities within our borders. Simply because we have permitted that sites beyond our own borders be considered as part of the analysis is no different from requiring that the municipality that seeks to enforce the buffer demonstrate permissible alternatives within our State.

When this Court considered the parameters for cases like this one in *Saddle Brook*, we quoted a portion of Justice Blackmun's concurrence in *Schad*. *See Saddle Brook, supra,* 156 *N.J.* at 593, 722 *A.*2d 530. Significantly, it was not the language seized upon by the Appellate Division's majority in the matter now before this Court on appeal, but a somewhat broader view of the subject at hand. As Justice Blackmun observed:

> This case does not require articulation of a rule for evaluating the meaning of "reasonable access" in different contexts. The scope of relevant zoning authority varies widely across our country, as do geographic configurations and types of commerce among neighboring communities, and this issue will doubtless be resolved on a case-by-case basis.
>
> [*Schad, supra,* 452 *U.S.* at 77–79, 101 *S.Ct.* at 2187–88, 68 *L.Ed.*2d at 686–87 (footnote omitted).]

Today we do no more than hold that as a part of the evaluation of the regional market, it is permissible to consider not only the "neighboring communities" that lie within our State's borders, but to consider as relevant to the question those "neighboring communities" that are beyond those borders.

Our conclusion in this appeal is a narrow one. We do not suggest that a record that demonstrates that the only available alternate sites are beyond our borders would be constitutionally

defensible. Nor do we suggest that a record in which the majority of such sites are in another state would pass constitutional muster. But travel between states on our roads and through our public transportation system, factors that both experts in this case found relevant to their market analysis, is a fact of our modern life in our increasingly mobile society. To ignore that reality would be error.

As we have observed, the challenge to our trial courts in considering matters of this type is a "formidable" one. *Saddle Brook, supra,* 156 *N.J.* at 596, 722 *A.*2d 530. It requires careful balancing of competing interests that play out against the backdrop of the constitutional rights that we recognize inform the debate. As our Appellate Division has observed, these are difficult, fact-sensitive, inquiries:

> Thus, the first step under *Saddle Brook* will be the determination of the relevant market area. Second, the trial court must determine the availability of suitable sites within that market area. With these two findings in mind, the court must then determine whether the number of suitable sites in relation to the size of the market area, provides defendants with enough alternatives to withstand constitutional scrutiny. Stated differently, five suitable sites within a ten-mile market area may be enough to satisfy constitutional concerns. The same number of suitable sites within a fifty-mile market area may not be. Ultimately, what will be constitutionally sufficient will depend upon an exquisite exercise of judicial authority, guided by the fundamental principles embodied in the First Amendment. [*Twp. Of Cinnaminson v. Bertino,* 405 *N.J.Super.* 521, 537, 966 *A.*2d 14 (App.Div.), *certif. denied,* 199 *N.J.* 516, 973 *A.*2d 384 (2009).]

In a like fashion, the trial court might conclude that the number of alternative sites, even when some found in a neighboring state are included, is insufficient for First Amendment purposes. On the other hand, it might conclude that sites in a neighboring state, by reason of ease of access, sufficiently expand the pool of alternative sites as to permit enforcement of an ordinance. Although a record in which the only alternative avenues, or the great majority of alternative avenues, are outside of New Jersey would never be sufficient to withstand an as-applied challenge, a trial court is not required to ignore the existence of such alternatives. We hold only that the availability of such sites is an appropriate factor to consider as part of evaluating whether there are ade-

quate alternative channels of communication within the relevant market area.

## III.

The judgment of the Appellate Division is reversed only to the extent that it precluded consideration of alternative sites in Staten Island; in all other respects the judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

Today, this Court becomes the first in the nation to suggest that a state can geographically restrict constitutionally permissive expression within its borders, in part, by offering a neighboring state as an alternative forum. A sexually oriented gentlemen's club, although a disfavored form of expression by many, is nonetheless protected by both the First Amendment of the United States Constitution and Article 1, Paragraph 6 of the New Jersey Constitution. At issue is whether New Jersey can tell one of its citizens that a sexually oriented business cannot be operated in a particular location in the State because—as part of this Court's equation—a neighboring state will accommodate its expressive activities.

*N.J.S.A.* 2C:34-7(a) prohibits a sexually oriented business from operating within 1,000 feet of certain places, such as schools, child care centers, playgrounds, residentially zoned areas, and houses of worship. This statute is constitutional, as applied, only if a sexually oriented business is provided with "adequate alternative channels of communication within the relevant market area." *Twp. of Saddle Brook v. A.B. Family Ctr., Inc.,* 156 *N.J.* 587, 596–97, 722 *A.*2d 530 (1999).

In my view, New Jersey cannot under the federal or state constitution restrict the location of sexually oriented expression without providing that expression a safe haven somewhere within this State's borders. A sexually oriented business cannot be restricted based on the notion that such constitutionally protected expressive activity is permitted in a nearby state. Even aside

from the Court's multi-state regional approach to constitutional rights, the standard it adopts adds another confounding layer of complexity to a test already difficult enough to implement. Our judges will now have to become conversant with the land-use laws and political realities of zoning in neighboring states.

New Jersey's citizens have a federal and state constitutional right to express themselves in *their* State, regardless of whether there is an available forum in a neighboring state. Because the majority has ruled otherwise, I respectfully dissent.

## I.

The First Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment, and therefore New Jersey and its subdivisions may not pass laws "abridging the freedom of speech." *See Edwards v. South Carolina,* 372 *U.S.* 229, 83 *S.Ct.* 680, 9 *L.Ed.*2d 697 (1963); *see also U.S. Const.* amend. I ("Congress shall make no law ... abridging the freedom of speech...."). Sexually oriented speech and expressive activities are protected under the First Amendment. *See, e.g., Schad v. Borough of Mount Ephraim,* 452 *U.S.* 61, 66, 101 *S.Ct.* 2176, 2181–82, 68 *L.Ed.*2d 671, 678 (1981) (protecting non-obscene nude dancing); *City of Renton v. Playtime Theatres,* 475 *U.S.* 41, 47, 106 *S.Ct.* 925, 928, 89 *L.Ed.*2d 29, 37 (1986) (protecting adult theaters); *Smith v. California,* 361 *U.S.* 147, 154–55, 80 *S.Ct.* 215, 219–20, 4 *L.Ed.*2d 205, 211–12 (1959) (protecting adult bookstores). Such speech or expression, however, is subject to reasonable time, place, and manner regulations. *Renton, supra,* 475 *U.S.* at 46–47, 106 *S.Ct.* at 928, 89 *L.Ed.*2d at 37.

In *Renton,* the United States Supreme Court upheld the constitutionality of a municipal ordinance, worded similarly to *N.J.S.A.* 2C:34–7, because the city used its zoning power not to suppress expression, but rather to make it available in certain other areas within the city's borders.[1] *Renton, supra,* 475 *U.S.* at 54, 106

---

[1] New Jersey's statute requires a 1,000–foot buffer between any sexually oriented business and

*S.Ct.* at 932, 89 *L.Ed.*2d at 42. The Court made clear that the First Amendment barred Renton "from effectively denying" the owners of an adult theater "a reasonable opportunity to open and operate" the theater "within the city." *Ibid.*

In *Schad,* the Supreme Court invalidated a municipal ordinance that prohibited all live entertainment, including non-obscene nude dancing, in the Borough's commercial district. 452 *U.S.* at 76–77, 101 *S.Ct.* at 2186–87, 68 *L.Ed.*2d at 685. The Borough violated the First Amendment by not "leav[ing] open adequate alternative channels of communication" within the municipality for the owner of an adult bookstore who provided his customers with live nude dancing. *Id.* at 75–76, 101 *S.Ct.* at 2186, 68 *L.Ed.*2d at 685. The Court acknowledged that a county-wide-zoning approach might have passed muster, but such an approach was not before the Court and the Borough had not shown that the adult bookstore's exhibition was "available in reasonably nearby areas." *Id.* at 74–76, 101 *S.Ct.* at 2186–87, 68 *L.Ed.*2d at 685. Neither *Renton* nor *Schad* intimated that a municipality could satisfy its First Amendment obligations by pointing to an adjoining state that permitted sexually oriented businesses. Significantly, in his concurring opinion in *Schad,* Justice Blackmun declared: "Were I a resident of Mount Ephraim, I would not expect my right to attend the theater or to purchase a novel to be contingent upon the availability of such opportunities in 'nearby' Philadelphia, a community in whose decisions I would have no political voice." *Schad, supra,* 452 *U.S.* at 78, 101 *S.Ct.* at 2188, 68 *L.Ed.*2d at 686 (Blackmun, J., concurring).

In *Saddle Brook,* this Court permitted a regional approach to alternative avenues of communication when analyzing the constitu-

---

any church, synagogue, temple or other place of public worship, or any elementary or secondary school or any school bus stop, or any municipal or county playground or place of public resort and recreation, or any hospital or any child care center, or within 1,000 feet of any area zoned for residential use.
[*N.J.S.A.* 2C:34-7 (a).]

tionality of *N.J.S.A.* 2C:34–7, a state-wide restriction on the location of sexually oriented businesses.[2] 156 *N.J.* at 596–97, 722 *A.*2d 530. In that case there was no area within Saddle Brook for a sexually oriented business to operate without violating *N.J.S.A.* 2C:34–7. *Id.* at 591, 722 *A.*2d 530. This Court upheld the statute's constitutionality as applied to Saddle Brook provided there were "adequate alternative channels of communication within the relevant market area." *Id.* at 596–97, 722 *A.*2d 530. The relevant market area "include[d] areas located in other municipalities within reasonable proximity to the Saddle Brook location." *Id.* at 597, 722 *A.*2d 530 (internal quotation marks omitted). Nowhere in *Saddle Brook* did the Court even remotely suggest that Manhattan, a municipality a short distance away, would fall within the relevant market area. This Court noted that "the constitutionality of a *state statute* . . . need not be determined solely by reference to the boundaries of the municipality." *Id.* at 591, 722 *A.*2d 530. The Court did not intimate that the constitutionality of a state statute can be determined by looking outside the state's borders.

The *Saddle Brook* approach already is the most expansive geographical "place" regulation of a sexually oriented business in the nation, but—to my mind—it is a sensible and constitutional approach in a state with 566 municipalities, some smaller than a square mile. *Saddle Brook* comports with our nation's alternative-avenues-of-expression jurisprudence: a municipal zoning ordinance regulating sexually oriented businesses must make available sites within the municipality; a county-wide regulation must make available sites within the county; and a state-wide regulation must make available sites in nearby municipalities within the state. The majority takes *Saddle Brook* beyond the constitutional tipping point by allowing consideration of out-of-state sites.

---

[2] New Jersey appears to be one of only a few states to enact a state-wide restriction; in most states, these buffer zones are enacted at the local level.

Since *Renton*, a few federal courts have addressed the possibility of considering sites outside the municipality whose ordinance is at issue; however, they ultimately avoided deciding the matter. *See, e.g., Ill. One News, Inc. v. City of Marshall*, 477 *F*.3d 461, 463–65 (7th Cir.2007) (discussing possibility of considering available sites in neighboring jurisdictions but declining to reach a decision); *Boss Capital, Inc. v. Casselberry*, 187 *F*.3d 1251, 1254 (11th Cir.1999) (acknowledging sites available outside city in question, but in light of unsettled nature of *Schad* "opt[ing] to leave [the issue] open"). Other jurisdictions have considered only available sites within the political subdivision whose ordinance is in question. *See, e.g., Topanga Press, Inc. v. City of Los Angeles*, 989 *F*.2d 1524, 1532–33 (9th Cir.1993) (limiting analysis of alternative sites to those sites within City of Los Angeles), *cert. denied*, 511 *U.S.* 1030, 114 *S.Ct.* 1537, 128 *L.Ed.*2d 190 (1994); *Int'l Eateries of Am. v. Broward Cnty.*, 941 *F*.2d 1157, 1164 (11th Cir.1991) (looking only to available sites within Broward County to determine whether county-wide zoning scheme was constitutional), *cert. denied*, 503 *U.S.* 920, 112 *S.Ct.* 1294, 117 *L.Ed.*2d 517 (1992); *Ranch House, Inc. v. Amerson*, 22 *F.Supp.*2d 1296, 1309 (N.D.Ala. 1998) (upholding state buffer zone statute where there were ample available sites located in same county as well as throughout state).

No court—until today—has held that a state can deny a sexually oriented business its right of expression in one state by asserting that an alternative channel of communication is available in another state. In my view, under the First Amendment, a state must give constitutionally protected speech, however disfavored, a home within its own boundaries, without reference to its availability in an adjoining state.

This Court has held that "the New Jersey Constitution's right of free speech is broader than the right against governmental abridgement of speech found in the First Amendment." *N.J. Coal. Against War in the Middle E. v. J.M.B. Realty Corp.*, 138 *N.J.* 326, 353, 650 *A*.2d 757 (1994); *see also Green Party v. Hartz Mountain Indus.*, 164 *N.J.* 127, 145, 752 *A*.2d 315 (2000) ("[T]he

New Jersey[ ] Constitution's free speech provision is an affirmative right, broader than practically all others in the nation.").[3] It cannot be that the right to exercise expressive rights in this State under the New Jersey Constitution depends *in any measure* on whether alternative avenues of communication are available in another state. If our State places restrictions on disfavored speech or expressive activities, the solution is not that New Jersey citizens can exercise their rights in another state. However convenient it may be for New Jersey citizens to travel to Staten Island, that cannot be a basis to abridge their rights in this State.

## II.

Last, the majority's approach is not only unconstitutional, but unworkable and will generate needless litigation. The consideration of out-of-state sites will complicate an already "complex and detailed" analysis. *DEG, LLC v. Twp. of Fairfield*, 198 *N.J.* 242, 258, 966 *A*.2d 1036 (2009). The present regional inquiry "entails, among other things, expert assessments of the size of the relevant market; the absolute number of available locations; the relative number of such locations to land mass; the ratio of locations to population; and the qualitative availability of particular properties in light of their own unique characteristics." *Ibid.* Now, trial courts will also have to balance the number of out-of-state locations with in-state locations. Moreover, as New Jersey borders New York, Pennsylvania, and Delaware, trial judges will be forced to evaluate the statutory laws of these states and the zoning regulations of its municipalities. Our judges will have to become conversant, if not experts, on land-use laws applying to Staten Island, Manhattan, Philadelphia, and all other neighboring out-of-state municipalities.

---

[3] Article 1, Paragraph 6 provides that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." *N.J. Const.* art. 1, ¶ 6.

This cannot be the equation that our Court had in mind in *Saddle Brook.* The majority now takes the reasoning of that case to an impractical and unconstitutional conclusion.

For these reasons, I respectfully dissent.

*For reversal in part/affirmance in part*—Chief Justice RABNER, Justices LONG, HOENS, PATTERSON, and WEFING (temporarily assigned)—5.

*For Dissent*—Justice ALBIN—1.

*Not Participating*—Justice LaVECCHIA—1.